[PUBLISH]

In the

# United States Court of Appeals

## For the Eleventh Circuit

_____

No. 20-13364

_____

QUINCY A. WILLIAMS,

Plaintiff-Appellant,

*versus*

CORRECTIONAL OFFICER RADFORD,
c/o Alexandria Williams
Office of the General Counsel
501 S Calhoun Street
Tallahassee, FL 32399-2500
 in his individual capacity,
CAPT. SCARPATI,
in his individual capacity,
CORRECTIONAL OFFICER WILKINSON,
in her individual capacity,
OFFICER BADCOCK,

Correctional Officer, in his official capacity,
CORRECTIONAL OFFICER SHORT, et al.,

                                                    Defendants-Appellees.

————————————

Appeal from the United States District Court
for the Southern District of Florida
D.C. Docket No. 2:18-cv-14107-RLR

————————————

Before JORDAN, LUCK, and LAGOA, Circuit Judges.

JORDAN, Circuit Judge:

Quincy Williams, a Florida prisoner, filed a *pro se* civil rights suit against several prison officials under 42 U.S.C. § 1983. He alleged that Captain Albert Scarpati retaliated against him in various ways—including placing him in disciplinary/segregated confinement—because of complaints he made and grievances he filed. He also alleged that Officer Erick Radford beat him while he was handcuffed, and that Officers Brian Babcock and Cameron Short held him down and failed to intervene during the assault.

The district court granted summary judgment in favor of Captain Scarpati and Officers Radford, Babcock, and Short on all of Mr. Williams' claims. Viewing the evidence in the light most favorable to Mr. Williams, and with the benefit of oral argument, we

vacate the grant of summary judgment except as to one of the alleged instances of retaliation.

## I

We review a district court's grant of summary judgment de novo. *See Marbury v. Warden*, 936 F.3d 1227, 1232 (11th Cir. 2019). Summary judgment is warranted "when the evidence, viewed in the light most favorable to the nonmoving party, presents no genuine issue of material fact and compels judgment as a matter of law in favor of the moving party." *Owusu-Ansah v. Coca-Cola Co.*, 715 F.3d 1306, 1307 (11th Cir. 2013) (citation omitted). We credit the "specific facts" that Mr. Williams testified to, including those set out in his verified pleadings and filings. *See, e.g., Perry v. Thompson*, 786 F.2d 1093, 1095 (11th Cir.1986).

## A

Mr. Williams contends that when he complained about Captain Scarpati's behavior, he set off a chain of events that were meant to intimidate and silence him. The first relevant incident took place on Friday, October 27, 2017, when Mr. Williams tried to send out legal mail. That day, the running of meals was delayed as it "normally" was, "[a]nd for some reason the [mail official] sa[id] I'm done. [I'm] fixing to leave." D.E. 113-1 at 28. Mr. Williams stated in his affidavit that the mail official said "that she had waited long enough an[d] no one showed up and she was leaving." D.E. 121-1 at 19. Mr. Williams was told he would have to wait until Monday to send out his mail. *See* D.E. 113-1 at 28–29. As waiting until the

following week would cause him to miss a legal deadline, Mr. Williams asked Captain Scarpati, "[Y]ou can't get her to come back? . . . You're not going to let her come back so we can get this?" *Id.* at 29.

Captain Scarpati responded: "Hey, she [is] gone. See you Monday." *Id.* Mr. Williams then tried to complain to the assistant warden. Mr. Williams explained that when Captain Scarpati saw him "trying to talk to" the assistant warden he "sent an officer and told him to put [Mr. Williams] in handcuffs." *Id.* at 36. Mr. Williams testified that he was then handcuffed and told by Captain Scarpati, "Look, you disrespect[ed] me just then. You know you just disrespected me? . . . In my face, you [are] going to try to go over my head?" *Id.* at 37.

Mr. Williams "was place[d] in [disciplinary/segregated] confinement for several day[s] without a written disciplinary report." D.E. 121-1 at 20. Following the incident, Mr. Williams filed a grievance against Captain Scarpati for "retaliation for trying to get [his] legal mail out which [he had] a right to do." D.E. 113-1 at 43. He asserted in his verified complaint that no one responded to this grievance. *See* D.E. 1 at 7.[1]

---

[1] At times, Mr. Williams refers to "jail" or "confinement" when discussing his disciplinary/segregated confinement. During his deposition, Mr. Williams testified that "jail" means "segregated confinement." *See* D.E. 113-1 at 38. He went on to explain that there is "administrative confinement" and "disciplinary confinement." *Id.* at 39. For clarity, we will use "disciplinary/segregated confinement" throughout this opinion.

According to Mr. Williams, Captain Scarpati "continue[d] to retaliate[ ] against" him. *See* D.E. 121-1 at 20. On November 14, 2017, Captain Scarpati and another official went to Mr. Williams' cell during inspection. Captain Scarpati made Mr. Williams get off his bunk, "got in [his] face," and "told [Mr. Williams] he would write [him] up anytime he feels like it." D.E. 113-1 at 43–45. *See also* D.E. 121-1 at 20. Captain Scarpati further told Mr. Williams that he'd "personally" take him to "jail." D.E. 113-1 at 45. Undeterred, Mr. Williams filed a grievance about this new threat. *See* D.E. 1 at 8 ("Again I wrote this incident up under reprisal and threats of harm which was denied.").

Soon thereafter, in December of 2017, a correctional officer came into Mr. Williams' cell. The officer "grabbed [Mr. Williams'] mattress" and "[threw] it out in the hallway." D.E. 113-1 at 48. She also grabbed his "legal material, [his] bag, [and his] canteen bag and dumped it out there." *Id.* The officer told Mr. Williams to "stop writing up [Captain] Scarpati." D.E. 121-1 at 21. *See also* D.E. 113-1 at 49. She told Mr. Williams' roommate, "Look, I'm fixing to search your bunk and stuff because he wants to keep writing up [Captain] Scarpati." D.E. 113-1 at 47. *See also* D.E. 121-1, Exh. A (Declaration of Inmate Tony Harris, explaining that the officer told Mr. Williams to "stop writing up Capt. Scarp[ati]"). Mr. Williams submitted a grievance about this incident as well. *See* D.E. 113-1 at 48.

Later that month, four correctional officers came to Mr. Williams' cell. They placed Mr. Williams and his cellmate in

6                    Opinion of the Court                    20-13364

handcuffs and conducted a search of the cell. The officers showed Mr. Williams a homemade knife that they said had been found in his pillow. *See* D.E. 113-1 at 56–57. *See also* D.E. 121-1 at 21. One of the officers told Mr. Williams that Captain Scarpati had "told them to come down there and tear up [Mr. Williams'] house." D.E. 113-1 at 53. Mr. Williams testified that an officer "admitted they . . . plant[ed] that knife when [he] didn't have a knife." *Id.*

Following the search, Mr. Williams was escorted to disciplinary/segregated confinement. While being taken there, the escorting officer said to Mr. Williams "you need to leave [Captain] Scarpati alone," and Mr. Williams got into a "verbal dispute" with her. *See* D.E. 113-1 at 59; D.E. 121-1 at 22. *See also* Appellees' Br. at 5 (conceding that any threats Mr. Williams made were verbal, not physical).[2]

Because Mr. Williams was "causing a disturbance," he was taken directly to disciplinary/segregated confinement. The normal protocol at the prison appeared to call for an inmate to be taken to the medical unit for a "pre-confinement" evaluation

---

[2] Mr. Williams allegedly told the escorting officer, "You are a fag and want to be a man[,] so I am going to hit you like a man[,] bitch." D.E. 113-6 at 1. He also reportedly said, "I have a life sentence, you are fucking with the wrong one. You better watch your back." *Id.* This resulted in a disciplinary charge being filed against Mr. Williams, who pled not guilty to the charge. *See* D.E. 113-6 at 5. Mr. Williams was found to have threatened the officer, but the warden later overturned that finding. *See* D.E. 1 at 12.

20-13364                Opinion of the Court                7

before being placed in disciplinary/segregated confinement.  *See* D.E. 121-1 at 22.  *See also* D.E. 113-1 at 68.[3]

When Mr. Williams reached the confinement area, several officers, including Officers Radford, Babcock and Short, were there.  *See* D.E. 113-1 at 70.  Officer Radford "grabbed" him from the escorting officer.  *See id.* at 70-71.  According to Mr. Williams, Officer Radford then "rammed [him] into the wall where [Officers] Short and Babcock held [him,] when [Officer] Radford hit [him] several time[s] with glove[d] fist in the face and head."  D.E. 121-1 at 22.  Here is how Mr. Williams described the assault at his deposition:

> [Officer Radford] just grabbed me from [the escort officer] and sa[id] "Oh, you being disorderly," and when he grabbed me, I'm already handcuffed in hand restraints behind my back.  He grabbed me and grabbed me by the neck. . . . And bent me over and ran me into the wall.  And [Officers] Short and Babcock came

---

[3] Captain Scarpati and Officers Babcock, Short, and Radford asserted that Mr. Williams was taken for a pre-confinement medical examination but was uncooperative and refused a medical exam.  *See* D.E. 114 at 4.  They provided a "Refusal of Health Care Services" form as evidence of Mr. Williams' refusal.  *See* D.E. 114-11.  The form, dated December 23, 2017, provides a space for the inmate to sign, certifying that he is refusing certain services—here, the pre-confinement evaluation—but Mr. Williams did not sign and the signature line states "refused to sign."  *Id.*  Meanwhile, a "Report of Administrative Confinement," also dated December 23, 2017, indicates that on that date, Mr. Williams "was escorted to medical and was seen by medical staff for pre-confinement physical."  D.E. 113-10.

over there and held me, assisted him and he got off like six or seven good hits in my face, head, everywhere. . . [H]e just swung on me, just punching me . . . and I got my head down trying to avoid [him] hitting me in the face, but he busted my lip and hit me in the head. [He][c]hoked me, hit me around the head and held me.

D.E. 113-1 at 71–72.

Mr. Williams sustained injuries from the beating, including "knots on [his] head," a swollen jaw, and a busted lip. *See id.* at 73. Mr. Williams told Captain Scarpati that he needed medical assistance but Captain Scarpati "refused to let [him] get medical help." *See id.* at 74–75. *See also* D.E. 121-1, Exh. B (Declaration of Inmate Kunta Kinte Porter: "Officer Radford punched inmate Quincy Williams in the mouth busting his bottom lip as he requested medical attention by Captain Scarpati which he refused inmate Williams medical attention and threaten[ed] him with chemical agents if he didn't stop requesting medical attention."). At some point—"[10] days, a week, 10, 15 days later"—Mr. Williams saw medical personnel. *See* D.E. 113-1 at 75. He "[s]till had a scar on [his] face, still had bruises . . . [his] jaw was still hurting, [he] had migraine headaches," and he had two "loose teeth." *Id.*

At a later disciplinary hearing, Mr. Williams was found to have possessed a weapon—the knife found in his cell—despite his claim that the officers had planted the knife at the direction of Captain Scarpati. He was also found to have made threats to his

20-13364                Opinion of the Court                9

escorting officer while he was being moved from general population into disciplinary/segregated confinement. The finding regarding the threats, however, was subsequently overturned by the warden. *See* D.E. 1 at 12.

## B

In 2018, Mr. Williams filed a § 1983 civil rights suit against Captain Scarpati for retaliation, Officer Radford for excessive force, and Officers Babcock and Short for failure to intervene. The defendants moved for summary judgment and Mr. Williams filed a response in opposition to that motion. The magistrate judge issued a report recommending that the defendants' motion be granted as to these claims.

In evaluating the retaliation claim, the magistrate judge focused exclusively on the alleged planting of the knife in Mr. Williams' pillow and did not consider the evidence that Mr. Williams' complaints and grievances caused Captain Scarpati to place him in disciplinary/segregated confinement and to order a search of his cell. The magistrate judge concluded that because Mr. Williams conceded that he was found guilty of possession of a weapon in a formal disciplinary proceeding—and thus provided due process—and because there was some evidence supporting that infraction, our decision in *O'Bryant v. Finch*, 637 F.3d. 1207, 1215 (11th Cir. 2011), foreclosed his ability to raise a retaliation claim. *See* D.E. 128 at 14–18.

The district court adopted the magistrate judge's report as to Mr. Williams' retaliation claims concerning his placement in disciplinary/segregated confinement and the search of his cell. *See* D.E. 133 at 1. The district court concluded that Captain Scarpati presented evidence that Mr. Williams was placed in disciplinary/segregated confinement because he "violated protocol" in the manner he submitted his complaint about the mail, and said that Mr. Williams cited "no evidence" to suggest he was placed in such confinement because of his constitutionally protected speech. *See id.* at 2. The district court credited Captain Scarpati's declaration that the search of Mr. Williams' cell was random, and discounted Mr. Williams' statement in his deposition that one of the officers told him that Captain Scarpati had ordered the search. *See id.* The district court thus concluded that Mr. Williams had "not pointed to evidence to indicate the existence of a causal connection between his exercise of his First Amendment rights and any action taken by [Captain] Scarpati." *Id.* at 2–3.

With regard to the excessive force claim, the magistrate judge noted that Officers Radford, Babcock, and Short denied that the alleged beating ever occurred. Thus, Mr. Williams' "version of events" had to be credited. *See* D.E. 133 at 8. Nevertheless, the magistrate judge concluded that Mr. Williams admitted that he had been "disorderly." And the disciplinary report about the threats made to the escorting officer cut against Mr. Williams' argument that the force was applied "maliciously and sadistically for the very purpose of causing harm." *Id.* at 14 (citation omitted). Because the

existence of an excessive force violation is a prerequisite for a failure to intervene claim, the magistrate judge further concluded that the claims against Officers Babcock and Short necessarily failed. *See id.*

The district court did not separately address the excessive force or the failure to intervene claims in its order. It adopted the magistrate judge's report on these claims.

## II

We begin with Mr. Williams' retaliation claims against Captain Scarpati. Mr. Williams asserted three separate instances in which he was punished for complaining about Captain Scarpati. First, he was placed in disciplinary/segregated confinement for "disrespecting" Captain Scarpati by "try[ing] to go over [his] head" when talking to the assistant warden about his issue with legal mail. Second, his cell was searched and "trashed" on Captain Scarpati's orders and he was warned to "stop writing [Captain] Scarpati up." Third, officers planted a knife in his pillow so that he would once again be subject to disciplinary/segregated confinement. We conclude that only the third of these instances of retaliation was properly resolved by summary judgment and that the first two should proceed to trial. When the facts are viewed in Mr. Williams' favor, "the evidence is such that a reasonable jury could return a

verdict" in his favor on those two retaliation claims. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).[4]

To establish a retaliation claim, a prisoner must demonstrate "that the prison official's actions were the result of his having filed a grievance concerning the conditions of his imprisonment." *Farrow v. West*, 320 F.3d 1235, 1248 (11th Cir. 2003) (internal quotation marks and citation omitted). Mr. Williams can prevail on a retaliation claim if "(1) his speech was constitutionally protected; (2) [he] suffered adverse action such that the administrator's allegedly retaliatory conduct would likely deter a person of ordinary firmness from engaging in such speech; and (3) there is a causal relationship between the retaliatory action and the protected speech." *Smith v. Mosley*, 532 F.3d 1270, 1276 (11th Cir. 2008).

## A

When an inmate "complains to the prison's administrators about the conditions of his confinement," he is exercising his First Amendment right of freedom of speech. *See id.* Mr. Williams testified that he complained to the assistant warden about the mail, and that he filed grievances against Captain Scarpati based on the disciplinary/segregated confinement he received and the search and trashing of his cell. *See, e.g.,* D.E. 113-1 at 43 ("I wrote that up

---

[4] In the district court, Captain Scarpati did not make any substantive arguments about qualified immunity on the retaliation claims, *see* D.E. 113 at 7, and he does not assert qualified immunity on appeal. We therefore do not address qualified immunity as to him.

20-13364                Opinion of the Court                13

that [Captain Scarpati] locked me up in retaliation for trying to get my legal mail out").

Mr. Williams also described the "adverse actions" taken against him—e.g., the disciplinary/segregated confinement and the search and trashing of his cell—that would deter any ordinary inmate from making subsequent complaints. *See, e.g., id.* at 45 ("[Captain] Scarpati told me he would write me up anytime he feels like it. He [said] if I . . . write him up, he will write me up anytime he feel[s] like it . . . . He told me I'll take you to jail and I'll take you personally[.]"). We have already held that the search of an inmate's cell and the destruction of his possessions and materials can support a First Amendment retaliation claim. *See Wright v. Newsome*, 795 F.2d 964, 968 (11th Cir. 1986). And we now agree with our sister circuits that placing an inmate in disciplinary/segregated confinement constitutes an adverse action for purposes of a First Amendment retaliation claim. *See, e.g., Burns v. Martuscello*, 890 F.3d 77, 94 (2d Cir. 2018) ("Burns has provided evidence that he was subjected to a pretextual [involuntary protective custody] hearing, and placed on this restricted status for over six months. Such an injury more than suffices to show an adverse action."); *Mitchell v. Horn*, 318 F.3d 523, 530 (3d Cir. 2003) ("[W]e believe that several months in disciplinary confinement would deter a reasonably firm prisoner from exercising his First Amendment rights."); *Martin v. Duffy*, 858 F.3d 239, 250 (4th Cir. 2017) ("Certainly, placing an inmate in administrative segregation could deter a person of ordinary firmness from exercising his First Amendment

rights.") (internal quotation marks and citation omitted); *Herron v. Harrison*, 203 F.3d 410, 416 (6th Cir. 2000) (placement in administrative segregation is an adverse action which could dissuade a person of reasonable firmness from exercising his First Amendment rights); *Watison v. Carter*, 668 F.3d 1108, 1115 (9th Cir. 2012) (placement in administrative segregation constitutes an adverse action for a retaliation claim).

The next question is whether Mr. Williams has presented sufficient evidence to create an issue of fact as to a causal relationship between his complaints about Captain Scarpati and his subsequent placement in disciplinary/segregated confinement, the search and trashing of his cell, and the planting of a weapon in his pillow. We think that he has done so with respect to the first two alleged instances of retaliation.

In determining whether Mr. Williams has established a causal connection between his complaints and grievances and the adverse actions he suffered, "we ask[ ] whether [Captain Scarpati] w[as] subjectively motivated to discipline [Mr. Williams] because [he] complained of some of the conditions of his confinement." *Smith*, 532 F.3d at 1278. This motive analysis is subject to a burden-shifting framework. *See id.* (noting "that most courts resolve this subjective motivation issue under" the burden-shifting framework established in *Mt. Healthy City Sch. Dist. Bd. of Educ. v. Doyle*, 429 U.S. 274 (1977), which concerned employment retaliation). First, Mr. Williams must show that his constitutionally-protected speech was a "motivating factor" in Captain Scarpati's decisions to

carry out the adverse actions. *See Mt. Healthy*, 429 U.S. at 287. If Mr. Williams satisfies that burden, then Captain Scarpati must show that he would have implemented those adverse actions irrespective of Mr. Williams' complaints. *See id. See also Thaddeus-X v. Blatter*, 175 F.3d 378, 399 (6th Cir. 1999) (applying the *Mt. Healthy* burden-shifting framework to the prison context: "Once the plaintiff has met his burden of establishing that his protected conduct was a motivating factor behind any harm, the burden of production shifts to the defendant. If the defendant can show that he would have taken the same action in the absence of the protected activity, he is entitled to prevail on summary judgment.") (citation omitted).

The first instance of alleged retaliation involved Captain Scarpati placing Mr. Williams in disciplinary/segregated confinement. The district court credited Captain Scarpati's explanation that Mr. Williams "was placed in segregated confinement because he violated protocol the way that he had made his complaint about the mail, acted in a disorderly manner, and disrespected a correctional officer." D.E. 133 at 2. *See also* D.E. 114-3 at 2 (Declaration of Captain (now Major) Scarpati: "Inmate Williams was placed in administrative confinement for disobeying orders."). The district court went on to say that Mr. Williams did not cite to any evidence "to indicate that he was placed in segregated confinement for exercising his First Amendment rights." D.E. 133 at 2. But, as set out below, that was incorrect.

Mr. Williams testified that he was handcuffed and sent to disciplinary/segregated confinement because Captain Scarpati saw him "trying to talk" to the assistant warden about his legal mail and trying to "go over [Captain Scarpati's] head." D.E. 113-1 at 36–37. In his deposition, Mr. Williams explained that Captain Scarpati told him he was being disorderly (not that he was in fact disorderly) as pretext—"the quickest catchall"—for placing any inmate in disciplinary confinement. *See id.* at 36. In fact, Mr. Williams testified that he was sent to disciplinary/segregated confinement after Captain Scarpati saw him trying to speak to the assistant warden directly about the mail issue. *See id.* In addition, Mr. Williams averred that Captain Scarpati told him a month later that he did not care about the grievances and warned him that he could lock him up anytime because it was his prison. *See* D.E. 1 at 8. Captain Scarpati also said to Mr. Williams that when he filed a grievance against him, it "comes back to him." *Id.*

The district court seemed to take Captain Scarpati at his word and ignored Mr. Williams' testimony (and the reasonable inferences which could be drawn from it). Viewing the evidence in the light most favorable to Mr. Williams—as we must on summary judgment—we think that a reasonable jury could find that Captain Scarpati was motivated by (and wanted to deter) Mr. Williams' complaints against him. This first retaliation claim therefore survives summary judgment on the "motivating factor" issue.

We come to the same conclusion with respect to the second retaliation claim, the one concerning the search and trashing of Mr.

Williams' cell. Again, the district court seemed to credit Captain Scarpati's statements and discount Mr. Williams' version of events. The district court said that Mr. Williams "cite[d] to no evidence to indicate that the search of his cell was not random and was at [Captain] Scarpati's request." D.E. 133 at 2. But Mr. Williams provided enough evidence to support a jury finding that Captain Scarpati ordered the search and trashing of the cell because of the former's complaints.

Some time after Mr. Williams submitted a grievance regarding the incident with the legal mail, Captain Scarpati went to Mr. Williams' cell, "told [him] he d[id] not care about [his] grievances," and warned that he would "lock [Mr. Williams] up anytime he fel[t] like" it. *See* D.E. 1 at 8. Indeed, he said that "he w[ould] personally take [Mr. Williams] to confinement." *Id.* Captain Scarpati also told Mr. Williams that "when you write him up it comes back to him." *Id.* When Mr. Williams submitted another grievance regarding this threat, an officer came to his cell, "trashed [his] stuff," and warned him to "stop writing [Captain] Scarpati up." *See* D.E. 113-1 at 47–49. Mr. Williams submitted a grievance about this second threat, and soon thereafter officers executed a search of his cell (and allegedly planted a knife) on Captain Scarpati's orders. *See id.* at 49, 52–53 ("[A]nd when I was escorted, she told me that [Captain] Scarpati had told them to come down there and tear up my house. She admitted they had them to plant that knife when I didn't have a knife."). Mr. Williams' testimony directly contradicts Captain Scarpati's assertion that the initial search was "random." The

evidence—when viewed in Mr. Williams' favor—shows a causal connection between the submission of complaints and grievances and the initial search and trashing of the cell. Summary judgment was therefore not warranted with respect to the alleged retaliatory search and trashing of Mr. Williams' cell.[5]

## B

We end with the third and final instance of alleged retaliation—the purported planting of the knife in Mr. Williams' pillow—which we think the district court (and the magistrate judge) got right. There is certainly evidence (as with the two previous instances) to support a finding that Mr. Williams satisfied each of the elements necessary to establish a retaliation claim. But there is one important difference: Mr. Williams was charged with unlawful possession of the knife, received a disciplinary hearing on that charge, and was found to have possessed the knife. Under our precedent, if an inmate is "found guilty of an actual disciplinary infraction after being afforded due process," and "there was evidence to support the disciplinary panel's fact finding," he cannot assert a retaliation claim. *See O'Bryant,* 637 F.3d. at 1215.

Mr. Williams admits that he received a disciplinary hearing. *See* D.E. 113-1 at 76. Pursuant to the prison's policy (and assuming it was followed because Mr. Williams does not allege that it was

---

[5] In his summary judgment motion, Captain Scarpati did not make any argument about the second step of the *Mt. Healthy* burden-shifting framework. We therefore do not address this issue.

20-13364                Opinion of the Court                19

not), Mr. Williams was "advised of the charge[ ] against" him, was able to "request staff assistance" to prepare his case, and had the right to present witnesses through written statements to support his innocence. *See, e.g.,* D.E. 113-5 at 2 (disciplinary report for possession of weapon charge). He also had "the opportunity to make a statement in writing regarding the charge and provide information relating to the investigation." *Id.* According to his own testimony, Mr. Williams did in fact call witnesses at his hearing. *See* D.E. 113-1 at 76. He also provided a witness statement denouncing the legitimacy of the search and characterizing it as retaliation for his grievances. *See* D.E. 113-12. But Mr. Williams' evidence did not persuade the prison officials at the hearing because, after considering "all statements, documents, and evidence" before them, they found that he had indeed possessed the knife. *See* D.E. 113-5 at 4.

Mr. Williams maintains on appeal that the knife was planted in his cell, but he does not deny that he was afforded a hearing or that the prison officials based their findings on evidence. *O'Bryant* therefore controls, and Mr. Williams cannot pursue his retaliation claim concerning the planting of the knife. The district court properly granted summary judgment in favor of Captain Scarpati on this third retaliation claim.

## III

We next address Mr. Williams' Eighth Amendment excessive force claim against Officer Radford. The ultimate question is "whether force was applied in a good-faith effort to maintain or

restore discipline, or maliciously and sadistically to cause harm." *Wilkins v. Gaddy*, 559 U.S. 34, 37 (2010) (quotation and citation omitted).

## A

The magistrate judge explained that the case presented a debate about the reasonableness of the force used. *See* D.E. 128 at 12–13. Because Mr. Williams had been "disorderly" and made threats against the escorting officer, he could not show that Officer Radford applied force maliciously or sadistically for the purpose of causing harm. *See id.* at 14. As noted earlier, the district court adopted the magistrate judge's report on the excessive force claim but did not separately address it.

We disagree with the magistrate judge and the district court. At summary judgment, the inquiry is not whether the force used was definitively malicious or sadistic, but whether "the evidence, viewed in the light most favorable to the plaintiff, will *support a reliable inference* of wantonness in the infliction of pain." *Campbell v. Sikes*, 169 F.3d 1353, 1375 (11th Cir. 1999) (quoting *Whitley v. Albers*, 475 U.S. 312, 322 (1986)). Under that standard, and given the evidence in the record, summary judgment was inappropriate.

Mr. Williams provided specific testimony about the incident from his first-hand experience of the encounter. He testified that while he was handcuffed, and being held by Officers Babcock and Short, Officer Radford grabbed him by the neck, slammed him into a wall, hit him six or seven times in the face, "punch[ed]" him,

"choked" him, "busted [his] lip," and struck him in the head. *See* D.E. 113-1 at 71–72. *See also* D.E. 121-1, Exh. B (Declaration of Inmate Kunta Kinte Porter: "I observed Officer Radford punch inmate Quincy Williams in his mouth while being held by Officer Babcock . . . on December 23, 2017."). His injuries were significant enough—a busted lip, knots in his head, a swollen jaw, a crook in his neck, loose teeth, and bruises—to warrant medical treatment, which he sought the day after the alleged attack. *See* D.E. 131-1 at 73–78, 89. *See also* D.E. 113-16 (inmate sick-call request dated December 24, 2017). The pain from the beating persisted, and Mr. Williams said that he continued to suffer from headaches and that his prior back problems were aggravated after the incident. *See* D.E. 113-1 at 78.[6]

In evaluating an excessive force claim, we adhere to two equally important principles. The first is that unreasonable or unnecessary force does not necessarily constitute excessive force for purposes of the Eighth Amendment. *See Whitley*, 475 U.S. at 319. The second is that even though "the Constitution does not require comfortable prisons, it does not permit inhumane ones." *Campbell*, 169 F.3d at 1362. The Eighth Amendment excessive force

---

[6] We acknowledge that Officer Radford denied ever hitting or striking Mr. Williams. *See* D.E. 113-14 at 1. And the nurse who saw Mr. Williams stated in her medical report that there was "no indication for treatment" and that he had asked her to falsify her report to reflect that he sustained certain injuries. *See* D.E. 113-17. But given that we are required to view the evidence in the light most favorable to Mr. Williams at summary judgment, we credit his version of events, understanding that the actual facts may be different.

standard reflects these two principles.  Force that is "applied in a good-faith effort to maintain or restore discipline" is acceptable, while force that is inflicted "maliciously and sadistically to cause harm" is prohibited.  *See Wilkins,* 559 U.S. at 37.  To determine where force falls along this spectrum we look to five factors: "(1) the extent of injury; (2) the need for application of force; (3) the relationship between that need and the amount of force used; (4) any efforts made to temper the severity of a forceful response; and (5) the extent of the threat to the safety of staff and inmates, as reasonably perceived by the responsible officials on the basis of facts known to them."  *Campbell*, 169 F.3d at 1375 (internal quotation marks omitted).

The record indicates that Mr. Williams got into a "verbal dispute" with the escorting officer, "raising his voice," getting "loud with her," and making some threats.  *See* D.E. 121 at 2; D.E. 113-1 at 58.  But a prisoner initiating a verbal altercation does not give prison guards carte blanche to use force sadistically and maliciously.  Viewing the evidence in the light most favorable to Mr. Williams under the *Campbell* factors, Officer Radford was not entitled to summary judgment.[7]

---

[7] The magistrate judge seemed to believe that Mr. Williams admitted he was being "disorderly" while he was being escorted from his cell.  But Mr. Williams testified only that the officers characterized him as disorderly, not that he in fact was disorderly.  *See* D.E. 113-1 at 70 ("[Officer] Swain called it [in] and said we got an inmate that's being disorderly and we [are] sending him straight to confinement.").  *See also id.* at 71 ("And when [Officer Radford] grabbed me he sa[id], 'Oh, you being disorderly.'").  Moreover, Mr. Williams pled not

The first *Campbell* factor is the extent of the injury. As noted, Mr. Williams suffered injuries—a busted lip, knots in his head, a swollen jaw, a crook in his neck, loose teeth, and bruises—which warranted medical treatment. Those injuries weigh in his favor under *Campbell* at summary judgment. As the Supreme Court has explained, "[a]n inmate who is gratuitously beaten by guards does not lose his ability to pursue an excessive force claim merely because he has the good fortune to escape serious injury." *Wilkins*, 559 U.S. at 38.

The second *Campbell* factor—the need for application of force—weighs in favor of Officer Radford. Mr. Williams engaged in a verbal altercation with, and made threats to, the escorting officer. Our cases recognize that prison officials "may use force when necessary to restore order and need not wait until disturbances reach dangerous proportions before responding." *Bennett v. Parker*, 898 F.2d 1530, 1533 (11th Cir. 1990).

The remaining *Campbell* factors consider the relationship between the need for use of force and the amount of force used, the efforts made to temper the severity of a forceful response, and the extent of the threat to the safety of staff and inmates reasonably perceived by the responsible prison officials. Viewing the record in

guilty to the charge that he had threatened the escorting officer, and the finding on that charge was later overturned. *See* D.E. 1 at 12. For purposes of our analysis, we assume without deciding that the magistrate judge's understanding was correct.

the light most favorable to Mr. Williams, these factors weigh in his favor at summary judgment.

Mr. Williams was no longer in his cell (where the knife was found) and he was not armed. And he was handcuffed and being held by Officers Babcock and Short when Officer Radford used force. Although Mr. Williams was being disorderly, the altercation between him and the escorting officer was verbal and not physical. Moreover, there is nothing in the record indicating that Mr. Williams physically resisted being handcuffed and transported to disciplinary/segregated confinement before force was used against him. A reasonable jury could find, if it views the evidence and inferences in Mr. Williams' favor, that the threat to the safety of prison staff and other inmates—as perceived by those on the ground—was low.

Officer Radford did not make any efforts to temper a forceful response. He slammed Mr. Williams into a wall and repeatedly hit him while he was being restrained, causing him a number of injuries that required medical attention. We note in this respect that Officers Radford, Babcock, and Short do not assert that a certain level of force was, in their view, necessary under the circumstances, as they deny using any force against Mr. Williams. *See* *Perry*, 786 F.2d at 1095 (reversing summary judgment in favor of officers on inmate's excessive force claim in part because the "officers d[id] not state that unusual force by them was justified by [the inmate] resisting or himself using force," and instead "sa[id] that

they took him one by each arm and led him or escorted him into the [barber] shop").

On this record a reasonable jury could find that the amount of force used against Mr. Williams violated the Eighth Amendment. If Mr. Williams' version of events is believed, the evidence supports "a reliable inference of wantonness in the infliction of pain"—Officer Radford repeatedly struck a handcuffed, restrained, and unarmed prisoner several times because he "rais[ed] his voice." *Campbell*, 169 F.3d at 1375.

## B

Officer Radford relies in part on *Bennett*, 898 F.2d at 1530–31, where we rejected an inmate's § 1983 claim of excessive force and upheld the grant of summary judgment in favor of the correctional officers who had been sued. At the end of the day, *Bennett* does not help Officer Radford. We explain why below.

According to Mr. Bennett, when he asked a prison guard why he couldn't use the gymnasium, the guard "grabbed him by the throat" and yelled racial slurs at him. After Mr. Bennett "struggle[d]" to break free from the guard's grasp, another guard pushed him against the cell bars. Then the first guard (Officer Jackson) hit him with a nightstick. As a result, he suffered considerable and long-lasting pain. *See id.* at 1530–31, 1533.

We concluded that Mr. Bennett had not shown a constitutional violation. *See id.* at 1533. First, although other inmates had submitted affidavits saying that two officers grabbed Mr. Bennett

by the throat and pushed him against the bars, "no other evidence support[ed] his claim that Officer Jackson struck him with a nightstick." *Id.* Second, an inmate had to show "some evidence of injury beyond a minimal one," and the medical records "contain[ed] no report of head injuries or treatment for pain following the incident, even though [Mr. Bennett] had daily opportunities to seek medical assistance." *Id.* at 1533.

To the extent that *Bennett* suggests (or can be read to hold) that an inmate's first-hand account of excessive force needs corroboration to survive summary judgment, it is no longer good law in this circuit. Sitting en banc, we held several years ago that an affidavit which satisfies Rule 56 and is based on personal knowledge "may create an issue of material fact and preclude summary judgment even if it is self-serving and uncorroborated." *United States v. Stein*, 881 F.3d 853, 854 (11th Cir. 2018) (en banc). The same principle, of course, applies to a witness' first-hand account provided at a deposition. *See, e.g., Robinson v. Pezzat*, 818 F.3d 1, 9 (D.C. Cir. 2016) (holding that homeowner's uncorroborated deposition testimony created an issue of fact as to the circumstances surrounding the shooting of the family's dog: "Corroboration goes to credibility, a question for the jury, not the court.").[8]

---

[8] As noted earlier, Mr. Williams' testimony about the alleged assault by Officer Radford was corroborated in part by the declaration submitted by Mr. Kinte Porter, another inmate. *See* D.E. 121-1, Exh. B.

In addition, after *Bennett* was decided, the Supreme Court held that a prisoner "who is gratuitously beaten by guards does not lose his ability to pursue an excessive force claim [under the Eighth Amendment] merely because he has the good fortune to escape without serious injury." *Wilkins*, 559 U.S. at 38–39 (explaining that the Eighth Amendment focuses on the "nature of the force" used). Insofar as *Bennett* implied that serious or permanent injuries are required, any such implication has been abrogated by *Wilkins*.

## IV

Finally, we consider Mr. Williams' failure-to-intervene claim against Officers Babcock and Short. We conclude that the district court's grant of summary judgment on this claim must also be vacated.

"[A]n officer who is present at the scene and who fails to take reasonable steps to protect the victim of another officer's use of excessive force can be held liable for his nonfeasance." *Velazquez v. City of Hialeah*, 484 F.3d 1340, 1341 (11th Cir. 2006) (internal quotation marks and citation omitted). To survive summary judgment, Mr. Williams had to present sufficient evidence to permit a reasonable jury to find that Officers Babcock and Short were (1) in a position to intervene in an ongoing constitutional violation and (2) failed to do so. *See Priester v. City of Riviera Beach*, 208 F.3d 919, 924 (11th Cir. 2000) ("[A]n officer can be liable for failing to intervene when another officer uses excessive force.").

Of course, a failure-to-intervene claim requires an underlying constitutional violation. "[A]n officer cannot be held liable for failing to stop or intervene when there was no constitutional violation being committed." *Sebastian v. Ortiz*, 918 F.3d 1301, 1312 (11th Cir. 2019). The magistrate judge and the district court granted judgment in favor of Officers Babcock and Short based on their determination that Mr. Williams had not shown any Eighth Amendment violation. *See, e.g.,* D.E. 128 at 14 ("[E]ssential to any failure to intervene claim lies a central assumption: excessive force was applied."). Because the magistrate judge and the district court concluded that Officer Radford did not use excessive force, Officers Babcock and Short did not have any obligation to intervene.

As we have explained, however, genuine issues of material fact exist as to whether Officer Radford used excessive force against Mr. Williams. We therefore vacate the grant of summary judgment in favor of Officers Babcock and Short on the failure-to-intervene claim and remand for reconsideration of that claim. We express no view on its proper resolution.

## V

We vacate the district court's grant of summary judgment in favor of Captain Scarpati and Officers Radford, Babcock, and Short, with the exception of the retaliation claim against Captain Scarpati relating to the allegedly-planted knife. As to that claim, we affirm because Mr. Williams was found to have possessed that knife following a disciplinary hearing. On remand the district court

20-13364                Opinion of the Court                29

can consider any summary judgment issues that remain outstand-
ing, including those related to qualified immunity.

AFFIRMED IN PART, VACATED IN PART, AND REMANDED.