[DO NOT PUBLISH]

In the

# United States Court of Appeals

### For the Eleventh Circuit

————————————————

No. 23-11063

Non-Argument Calendar

————————————————

JEFFERY LORENZO HAYNES, JR.,

Plaintiff-Appellant,

*versus*

JAMES VOLPELLETTO,
Sergeant, Martin Correctional Institution,
in individual capacity,
BRIAN BABCOCK,
JAMES FOSTER,
Officers, Martin Correctional Institution,
in individual capacities,
CHESTER MERRILL,
Sergeant, Martin Correctional Institution,
in individual capacity,

CAMERON SHORT,
Officer, Martin Correctional Institution,
in individual capacity, et al.,

                                                Defendants-Appellees,

LAN PORTEUS,
Officer, Martin Correctional Institution,
in individual capacity,

                                                        Defendant.

_____

Appeal from the United States District Court
for the Southern District of Florida
D.C. Docket No. 2:22-cv-14006-WPD

_____

Before ROSENBAUM, JILL PRYOR, and GRANT, Circuit Judges.

PER CURIAM:

Jeffery Haynes, Jr., a Florida prisoner proceeding *pro se*, brought excessive force claims under 42 U.S.C. § 1983 against several corrections officers at the prison where he was incarcerated. The district court, applying *Scott v. Harris*, 550 U.S. 372 (2007),

rejected Haynes's version of the confrontation with the officers and then granted summary judgment to the officers.

On appeal, Haynes challenges the district court's orders (1) declining to appoint counsel, (2) denying a motion to compel discovery responses, and (3) granting summary judgment to the officers. We see no abuse of discretion in the district court's orders denying the motions to appoint counsel and to compel. We conclude that the district court erred in granting summary judgment to officer Marie Avant because according to Haynes's declaration, which is not blatantly contradicted by any video evidence, she punched him without any provocation. But as to the other officers, Haynes's version of events is blatantly contradicted by the prison's surveillance videos. We conclude that the district court did not err when it granted summary judgment to the other officers. Accordingly, we affirm in part and reverse in part.

## I.    FACTUAL BACKGROUND

Haynes was convicted in Florida state court of drug trafficking offenses and received a 15-year sentence. He entered the custody of the Florida Department of Corrections in January 2018. The next month, he was transferred to the Martin Correctional Institution ("MCI") to serve his sentence.

On the evening of May 17, 2018, officers at MCI tackled and restrained Haynes and sprayed him with a chemical agent. In the section that follows, we review the parties' factual dispute about what happened during the incident and then the procedural history of this lawsuit.

## A.    The May 17 Incident

Haynes and the officers offer dramatically different accounts of what happened on May 17. We begin by recounting Haynes's version of the events and then review the officers' version. We then discuss what is shown in the prison's surveillance videos.

### 1.  Haynes's Version

According to Haynes, on the evening of May 17, he was physically attacked by prison officers for no reason. The attack occurred shortly after officer Junior Garlobo gave Haynes permission to go to another dormitory, known as the C-Dormitory. When Haynes walked up to that building, he encountered officer Marie Avant. She approached Haynes very closely and asked, "why do you act like you know me?" Doc. 115 at 3.[1] Haynes responded, "get out [of] my face." *Id.* Avant then said, "I'm going to have you killed" and punched Haynes. *Id.* After throwing the punch, Avant went inside the C-Dormitory and called for assistance from other officers.

Soon, a group of officers attacked Haynes. Garlobo ran up to him and, without giving any warning, sprayed a chemical agent directly into Haynes's face. Officer Cameron Short slammed Haynes to the ground and handcuffed him. Although Haynes was subdued and handcuffed, Garlobo and Short, along with officers Brian Babcock, James Foster, Chester Merrill, Ian Porteus, and James Volpelletto, took turns kicking him, striking him in the head

---

[1] "Doc." numbers refer to the district court's docket entries.

with their radios, and hitting him with closed fists. Another officer, Albert Scarpati, watched the attack but did nothing to intervene.

After the attack, Haynes was brought into a dormitory, placed in a segregated confinement cell, and allowed to shower. As a result of the beating, one of Haynes's eyes was swollen shut, and one of his front teeth was knocked out. Yet he was denied any medical treatment. After waiting in the cell for approximately four hours, he was taken to the Charlotte Correctional Institution. The next morning, he was finally taken to a hospital.

### 2. The Officers' Version

Several of the officers—Babcock, Foster, Garlobo, Short, and Volpelletto—gave written statements about the May 17 incident. The officers reported that the incident began at 6:40 p.m. when they received a call for assistance from another officer.[2] Garlobo, the first officer to respond, approached Haynes and directed him "to submit to restraints." Doc. 83-2 at 2. But Haynes refused to comply. He balled up his fists and swung at Garlobo, saying "Fuck [y]ou." *Id.* Garlobo sprayed a chemical agent but missed Haynes, who ran away.

Other officers tried to stop Haynes. Volpelletto grabbed him and tried to take him to the ground. But Haynes bit Volpelletto in the arm and poked him in the eye. Babcock then tackled Haynes, who continued to fight. Garlobo and Short sprayed a chemical

---

[2] None of the officers identified who made the initial call for assistance or explained why assistance was needed.

agent at Haynes. Haynes then grabbed Babcock's penis. Merrill and Foster arrived on the scene and sprayed chemical agents at Haynes as well. The officers were then able to restrain Haynes.

The officers tried to escort Haynes to a nearby building, the D-Dormitory, but he refused to walk. They placed him in a wheelchair and pushed him to the dormitory. Once in the dormitory, Haynes received a cool water shower and was taken to a secure cell.

On the day of the incident, Garlobo, Short, Volpelletto, Babcock, and Foster prepared written reports describing what had occurred. Scarpati, the shift supervisor, reviewed their reports. He added a note that "[a]ll of the associated" surveillance video footage had been "burned to DVD for review." Doc. 83-23 at 2.

### 3. The Surveillance Videos

Surveillance cameras at MCI captured some of the incident. Two video cameras, which were mounted in the prison's yard, captured an incident that occurred at the same time and in the same place where Haynes said Garlobo and the other officers attacked him. The videos show Haynes running across the prison yard and fleeing several officers. After brief pursuit, an officer tackled Haynes. Several other officers then brought him to the ground.

Other surveillance cameras captured what later happened inside the D-Dormitory. Haynes was transported into the building in a wheelchair. Two officers lifted him out of the wheelchair and attempted to guide him to a nearby cell. He almost immediately fell to the ground. Officers lifted Haynes back to his feet and walked

him into a cell. He remained in the cell for approximately fifteen minutes.

Haynes was then taken from the cell and escorted down a hallway and into a room where he remained for approximately three minutes. There is no video recording of what occurred inside the room. Haynes, who was wearing leg restraints, was then escorted back to the area outside a holding cell.

Outside the holding cell, officers had Haynes kneel to the ground so that they could take off his leg restraints. Because Haynes would not allow the officers to take off the leg restraints, they forced him to lie down on his stomach. After an officer removed the leg restraints, Haynes stood up and was taken inside a cell.

## B.    Procedural Background

Haynes, proceeding *pro se*, sued the officers involved in the incident under 42 U.S.C. § 1983, claiming that the officers used excessive force during the incident in the prison yard. He alleged that each officer either participated in the beating or failed to intervene to stop it.

Shortly after filing his complaint, Haynes requested that the district court appoint counsel to represent him. The court denied his request.

Later, Haynes filed a motion requesting that the court open a federal investigation into the officers because they committed a crime when they attacked him. The district court denied the

motion, explaining it was without authority to grant the requested relief because "[t]he decision of whether to investigate, arrest, or prosecute government officers or officials is within the discretion of the United States Attorney." Doc. 64 at 1 (internal quotation marks omitted).

Officers Avant, Babcock, Foster, Garlobo, Merrill, Scarpati, and Volpelletto moved for summary judgment,[3] arguing that there was no constitutional violation. To support their motion, the officers submitted various records, including the written reports from Babcock, Foster, Garlobo, Short, and Volpelletto about the incident, as well as the surveillance videos and Haynes's medical records.

In the summary judgment motion, the officers acknowledged that the parties told two different stories about the incident on May 17. They argued that the district court should not rely on Haynes's version of the incident because the surveillance videos "clearly contradict[ed]" it. Doc. 84 at 7. They said that the videos showed that they used force and the chemical spray on Haynes

---

[3] Although the complaint also named Porteous and Short as defendants, neither of these defendants was served. The district court ultimately dismissed the claims against Porteous. The district court never entered an order dismissing the claims against Short; however, we conclude that it has nonetheless entered a final appealable order. *See Insinga v. LaBella*, 817 F.2d 1469, 1470 (11th Cir. 1987) (explaining that when "an action is dismissed as to all defendants who have been served and only unserved defendants remain, the district court's judgment may be considered a final appealable order"). On appeal, Haynes does not challenge the disposition of the claims against Porteous or Short.

only after he refused to submit to restraints and attacked the officers. They maintained that there was no constitutional violation because they used "limited force . . . to restore discipline" and "ceased" using force once Haynes stopped resisting. *Id.* at 5. And absent any use of excessive force, the officers argued, no officer committed a constitutional violation by failing to intervene.

Haynes opposed the summary judgment motion. He submitted declarations setting forth his account of the incident. He asserted that the videos submitted by the officers were "falsif[ied]." Doc. 113 at 7. According to Haynes, the only legitimate surveillance videos submitted by the officers were the ones from the D-Dormitory. He argued that the evidence viewed in the light most favorable to him showed that the officers used excessive force. Along with responding to the summary judgment motion, Haynes renewed his request that the court appoint him counsel.

Around the time that he responded to the summary judgment motion, Haynes filed a motion to compel, arguing that the officers had not provided sufficient responses to his discovery requests because, among other things, they had not produced the relevant surveillance videos. Notably, Haynes filed this motion after the court's deadline for the parties to complete discovery. The district court denied the motion.

The district court granted summary judgment to the officers. It explained that the videos from the prison yard showed that Haynes "was in full flight from pursuing officers when he was tackled to the ground" and that he continued to struggle against the

officers after he was tackled. Doc. 141 at 10. Because the surveillance videos "completely refuted" his account of the attack, the district court did not credit his version of events. *Id.* And because the videos showed that the officers used force to "restore order rather than to cause harm," the court concluded that there was no constitutional violation and granted summary judgment to the officers. *Id.* at 12. In its order, the district court also denied as moot Haynes's renewed request for appointment of counsel. The district court then closed the case.

This is Haynes's appeal.

## II.    STANDARD OF REVIEW

Several standards of review apply to this appeal.

We review the district court's denial of a motion to appoint counsel for an abuse of discretion. *Killian v. Holt*, 166 F.3d 1156, 1157 (11th Cir. 1999).

We review the district court's denial of a motion to compel discovery for an abuse of discretion. *Holloman v. Mail-Well Corp.*, 443 F.3d 832, 837 (11th Cir. 2006).

We review *de novo* the district court's grant of summary judgment. *Smelter v. S. Home Care Servs., Inc.*, 904 F.3d 1276, 1284 (11th Cir. 2018). At the summary judgment stage, we "constru[e] the facts and draw[] all reasonable inferences in favor of the non-moving party." *Id.* Summary judgment is appropriate if the record gives rise to "no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P.

56(a). A genuine dispute of material fact exists when "the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

We liberally construe the pleadings of a *pro se* litigant. *Campbell v. Air Jam. Ltd.*, 760 F.3d 1165, 1168 (11th Cir. 2014).

### III.    DISCUSSION

Haynes raises three arguments on appeal, challenging the district court's decisions (1) refusing to appoint counsel, (2) denying his motion to compel, and (3) granting summary judgment. We address each issue in turn.

### A.    The District Court Did Not Abuse Its Discretion in Declining to Appoint Counsel.

Haynes first challenges the district court's decision not to appoint counsel. "Appointment of counsel in civil cases is a privilege justified only by exceptional circumstances, not a constitutional right." *Rodriguez v. Burnside*, 38 F.4th 1324, 1335 (11th Cir. 2022) (internal quotation marks omitted). Here, we cannot say that the district court abused its discretion when it concluded that this case did not present exceptional circumstances requiring the appointment of counsel.

### B.    The District Court Did Not Abuse Its Discretion in Denying the Motion Seeking Additional Discovery.

Haynes also argues that the district court erred when it denied his motion to compel and should have allowed him to conduct

discovery about past complaints against the officers. The district court did not abuse its discretion, however, because Haynes's motion to compel was filed after the deadline for the parties to complete discovery. *See Avirgan v. Hull*, 932 F.2d 1572, 1580–81 (11th Cir. 1991) (recognizing that a district court may set limits on the time period for discovery).

## C.    The District Court Erred in Granting Summary Judgment to Avant But Did Not Err in Granting Summary Judgment to the Other Officers.

We now turn to Haynes's challenge to the district court's order granting summary judgment. In this section, we begin by identifying the operative facts. We then address why, given these facts, all the officers except for Avant are entitled to qualified immunity.

### 1.  The Operative Facts

To determine the operative facts, we begin by discussing the United States Supreme Court's decision in *Scott*, which addressed how we determine the operative facts for purposes of ruling on a summary judgment motion in a case involving video evidence. *See* 550 U.S. at 380–81.

In *Scott*, a driver led police on a high-speed chase. *Id.* at 374–75. To end the chase, an officer hit the driver's car from behind, which caused the driver to lose control and crash the car. *Id.* at 375. The crash left the driver severely injured. *Id.* He sued, alleging that the officer who hit his car used excessive force. *Id.* at 375–76. In support of his claim, the driver asserted that, throughout the chase,

he remained in control of his car, slowed for turns and intersections, and used his turn signals. *Id.* at 379. He also claimed that he had not run anyone off the road and was not a threat to pedestrians or other motorists. *Id.*

In considering whether the officer was entitled to summary judgment, the Supreme Court did not rely on the driver's version of the facts. *Id.* at 379–80. It determined that it could not credit the driver's account because a video of the chase "so utterly discredited" his version of the events that "no reasonable jury could have believed him." *Id.* at 380. The Court explained that "[w]hen opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Id.* In crediting the video over the driver's account, the Court noted that there was no "allegation[] or indication[] that this video[] was doctored or altered in any way" or "that what it depicts differed from what actually happened." *Id.* at 378.

Under *Scott*, when the record "so utterly discredit[s] the party's story that no reasonable jury could have believed that party," we must disregard that portion of the nonmoving party's version of events at the summary judgment stage. *Brooks v. Miller*, 78 F.4th 1267, 1278 (11th Cir. 2023) (alteration adopted) (internal quotation marks omitted); *Pourmoghani-Esfahani v. Gee*, 625 F.3d 1313, 1315 (11th Cir. 2015) (noting that video footage in case was "often not obviously contradictory" to the plaintiff's account and

crediting plaintiff's version "where no obviously contradictory video evidence [was] available"). But if the "recording renders a party's story merely unlikely yet does not necessarily contradict it, the default rule kicks in: we must accept the party's version for purposes of considering the motion for summary judgment." *Brooks*, 78 F.4th at 1278.

Based on *Scott*, we conclude that the material facts for purposes of summary judgment are as follows:

On May 17, Haynes received permission from Garlobo to visit the C-Dormitory. Outside that building, he encountered Avant who "encroached [his] personal space" and asked, "Why do you act like you know me?" Doc. 115 at 3. Haynes responded, "Get out [of] my face." *Id.* At that point, Avant said, "I'm going to have you killed," and she punched Haynes. *Id.* Avant then went into the C-Dormitory to request assistance from other officers.

For this portion of the incident, we credit Haynes's declaration describing his interaction with Avant. Notably, the officers have not introduced any evidence disputing Haynes's account. They have not, for example, introduced any statement from Avant denying that she threatened Haynes or punched him. Instead, all the officers' statements addressed what happened after Haynes interacted with Avant. And, the prison yard surveillance videos do not call into question Haynes's statement that Avant punched him because they captured only what happened after other officers began to chase him. We thus conclude that *Scott* is inapplicable because the videos do not "blatantly contradict[]" Haynes's testimony

that Avant punched him for no reason. 550 U.S. at 380; *see also Ramirez v. Martinez*, 716 F.3d 369, 374 (5th Cir. 2013) (concluding that video did not blatantly contradict plaintiff's version of events when the recording started after the incident between the plaintiff and the officer had begun).

The incident continued when Garlobo and other officers appeared on the scene. These officers pursued Haynes, who fled from them and ignored their commands. To subdue Haynes, officers tackled him, brought him to the ground, and sprayed a chemical agent.

For this portion of the incident, we do not credit Haynes's testimony that these officers, without any provocation, kicked him, hit him, and used pepper spray. This portion of Haynes's version of the incident is "so utterly discredited" by the surveillance videos from the prison yard that no reasonable jury could believe this aspect of his testimony. *See Scott*, 550 U.S. at 380. The videos show that, contrary to Haynes's version of events, officers pursued him only after he ran away and used force only after he was resisting.

Haynes nevertheless argues that we should not rely on the surveillance videos because, as he said in his declaration, they were falsified. But, as the officers' reports reflect, on the night of the incident Scarpati preserved the relevant surveillance videos and stored them on a DVD. Haynes alleged no facts to support his assertion that the videos were falsified. His conclusory assertion that they were is insufficient to create a genuine dispute of fact about whether the videos captured the incident when officers tackled and

restrained him. *See Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888 (1990) (refusing at the summary judgment stage to credit "conclusory allegations" in an affidavit); *McKenny v. United States*, 973 F.3d 1291, 1303 (11th Cir. 2020) ("[C]onclusory affidavits lack probative value.").

### 2. All the Officers Except for Avant Are Entitled to Qualified Immunity.

With this understanding of the relevant facts, we now consider whether the officers are entitled to qualified immunity. "Qualified immunity shields public officials from liability for civil damages when their conduct does not violate a constitutional right that was clearly established at the time of the challenged action." *Echols v. Lawton*, 913 F.3d 1313, 1319 (11th Cir. 2019) (internal quotation marks omitted). The rationale behind the doctrine is the balancing of "two important public interests: the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." *Davis v. Waller*, 44 F.4th 1305, 1312 (11th Cir. 2022) (internal quotation marks omitted). Under the balance that qualified immunity strikes, "all but the plainly incompetent or those who knowingly violate the law" enjoy its protection. *Malley v. Briggs*, 475 U.S. 335, 341 (1986).

To receive qualified immunity, an officer "bears the initial burden to prove that he acted within his discretionary authority." *Dukes v. Deaton*, 852 F.3d 1035, 1041 (11th Cir. 2017). The plaintiff then bears the burden of proving that the officer "violated a

constitutional right" and "the right was clearly established at the time of the violation." *Barnes v. Zaccari*, 669 F.3d 1295, 1303 (11th Cir. 2012). Here, Haynes does not dispute that the officers were engaged in discretionary functions, meaning he bore the burden of proving that they were not entitled to qualified immunity.

The Eighth Amendment "prohibits the unnecessary and wanton infliction of pain." *Thomas v. Bryant*, 614 F.3d 1288, 1303 (11th Cir. 2010) (internal quotation marks omitted). In the custodial setting, an Eighth Amendment violation occurs when officers use excessive force. *Id.* at 1303–04. In this setting, force is deemed legitimate, as opposed to excessive, if it is "applied in a good-faith effort to maintain or restore discipline" and not "maliciously and sadistically to cause harm." *Wilkins v. Gaddy*, 559 U.S. 34, 37 (2010) (internal quotation marks omitted). To determine whether an officer used excessive force, we consider five factors:

> (1) the extent of injury; (2) the need for application of force; (3) the relationship between that need and the amount of force used; (4) any efforts made to temper the severity of a forceful response; and (5) the extent of the threat to the safety of staff and inmates, as reasonably perceived by the responsible officials on the basis of facts known to them.

*Williams v. Radford*, 64 F.4th 1185, 1196–97 (11th Cir. 2023).

Based on these factors, "inferences may be drawn as to whether the use of force could plausibly have been thought necessary, or instead evinced such wantonness with respect to the

18　　　　　　　　　Opinion of the Court　　　　　　　23-11063

unjustified infliction of harm as is tantamount to a knowing willingness that it occur." *Skrtich v. Thornton*, 280 F.3d 1295, 1300–01 (11th Cir. 2002), *overruled on other grounds by Pearson v. Callahan*, 555 U.S. 223 (2009). We thus have recognized that "correctional officers in a prison setting can use pepper-spray or a takedown to subdue an inmate as long as a valid penological reason supports the use of such force." *Sconiers v. Lockhart*, 946 F.3d 1256, 1264 (11th Cir. 2020). "Unless it appears that the evidence, viewed in the light most favorable to the plaintiff, will support a reliable inference of wantonness in the infliction of pain . . . , the case should not go to the jury." *Whitley v. Albers*, 475 U.S. 312, 322 (1986).

Additionally, an "officer who is present at the scene and who fails to take reasonable steps to protect the victim of another officer's use of excessive force can be held personally liable for his nonfeasance." *Skritch*, 280 F.3d at 1301.

We conclude that Avant is not entitled to qualified immunity at the summary judgment stage. As we explained above, the evidence, when viewed in the light most favorable to Haynes, shows that Avant punched him when he did nothing to provoke her. This evidence is sufficient to support an inference that she gratuitously used force in violation of Haynes's constitutional rights. *See Sears v. Roberts*, 922 F.3d 1199, 1209 (11th Cir. 2019); *see also Skritch*, 280 F.3d at 1301–02 (concluding that officers used excessive force when they kicked, punched, and beat prisoner who was not resisting). And it was clearly established at the time that "the unjustified use of excessive force by a prison guard against an inmate" violated

the Eighth Amendment. *Davis v. Locke*, 936 F.2d 1208, 1213 (11th Cir. 1991).

But we conclude that the remaining officers—Babcock, Foster, Garlobo, Merrill, Scarpati, and Volpelletto—are entitled to qualified immunity. As we explained above, the surveillance videos blatantly contradict Haynes's version of the incident in the prison yard; they show that Babcock, Foster, Garlobo, Merrill, and Volpelletto applied force to restrain Haynes only after he defied the officers' commands and actively resisted their attempts to subdue him. In these circumstances, we conclude that these officers' limited use of force was reasonable. *See Sconiers*, 946 F.3d at 1265; *see also Danley v. Allen*, 540 F.3d 1298, 1307 (11th Cir. 2008) ("readily" concluding that the use of pepper spray following a prisoner's failure to obey an officer's order was constitutional), *overruled in part on other grounds as recognized by Randall v. Scott*, 610 F.3d 701, 709 (11th Cir. 2010). And because the use of force was reasonable, Haynes's failure-to-intervene claim against Scarpati also fails. *See Skritch*, 280 F.3d at 1301 (recognizing that for an officer to be liable for failing to intervene he must be present during "another officer's use of excessive force").

## IV.

For the above reasons, we affirm the district court's orders related to appointment of counsel and compelling discovery. We affirm the order granting summary judgment to Babcock, Garlobo, Merrill, Scarpati, and Volpelletto and reverse the order granting summary judgment to Avant.

**AFFIRMED IN PART, REVERSED IN PART.**