[PUBLISH]

In the

# United States Court of Appeals

For the Eleventh Circuit

_____

No. 21-10590

_____

ERIC K. BROOKS,

                                        Plaintiff-Appellant,

*versus*

D MILLER,
Officer,

                                        Defendant-Appellee.

_____

Appeal from the United States district court
for the Northern District of Florida
D.C. Docket No. 4:19-cv-00524-MW-MAF

_____

Before JORDAN, ROSENBAUM, and NEWSOM, Circuit Judges.

ROSENBAUM, Circuit Judge:

Everyone's heard the saying that "the camera doesn't lie." That notion lies at the heart of *Scott v. Harris*, 550 U.S. 372 (2007). Usually, on a motion for summary judgment, we view the evidence in the light most favorable to the nonmoving party—meaning we accept the nonmoving party's version of events if the parties disagree about what happened. But in *Scott*, a video told "quite a different story" than the plaintiff there. And the Supreme Court held that "[w]hen opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for the purposes of ruling on a motion for summary judgment." *Id.* at 380. In other words, *Scott* stands for the commonsense proposition that when a video proves that the plaintiff can't be telling the truth, we don't accept the facts as he alleges them, even for purposes of deciding a summary-judgment motion.

But *Scott*'s rule has its limits. Most obviously, it applies only when the video actually proves that the plaintiff's version of the facts cannot be true. When the action happens off camera and the audio doesn't clearly contradict the plaintiff's story, *Scott*'s rule becomes irrelevant. Under those circumstances, we default to the usual rule: we accept the nonmoving party's version of the facts in determining whether to enter summary judgment.

This appeal from an order granting summary judgment requires us to apply both the default rule and *Scott*'s rule in evaluating the evidence supporting Plaintiff-Appellant Eric K. Brooks's various claims. Brooks alleges that Defendant-Appellee Officer Damon Miller falsely arrested him, used excessive force in doing that, and then was deliberately indifferent to Brooks's alleged medical needs.

The dash-cam recording from Brooks's interaction with Officer Miller proves definitively that Miller did not falsely arrest Brooks. And though the dash-cam recording does not resolve Brooks's deliberate-indifference claim, Brooks hasn't shown that any violation Officer Miller may have committed was clearly established. So Officer Miller is entitled to qualified immunity on that claim as well. As for Brooks's excessive-force claim, the recording did not capture Officer Miller's physical arrest of Brooks, so we must rely on the default summary-judgment rule and assume the truth of Brooks's attestations that Miller used excessive force in arresting him. And when we do that, we must conclude that Brooks's excessive-force claim survives summary judgment.

For these reasons, we affirm the district court's entry of summary judgment in part and reverse in part. And we remand this matter to the district court for further proceedings consistent with this opinion.

## I.   BACKGROUND

### A. Factual Background

As we've mentioned, the record contains different versions of the facts.  To keep track of them, we set them out separately below.

#### 1.  Brooks's Version

Brooks filed a verified complaint, so we treat his allegations as his testimony.  *Sears v. Roberts*, 922 F.3d 1199, 1206 (11th Cir. 2019).

According to Brooks, on November 12, 2016, he was standing around with other people, when Officer Miller arrived on the scene.  Officer Miller stepped out of his car and "demand[ed] to talk to whomever it was that drove the black Kia" located nearby.

When Brooks started to walk away, Officer Miller stopped him and asked for Brooks's identification.  But Brooks said he had "nothing to talk to [Officer Miller] about and he did not know who was driving" the Kia.

Officer Miller responded by grabbing Brooks by the shirt and "slam[ming] him into [Miller's] patrol vehicle."  Then Officer Miller "handcuffed [Brooks] so tight that sharp pain shot through [Brooks's] arms" and Brooks lost "all circu[]lation in his [w]ris[t] and arms."

With Brooks handcuffed, Officer Miller searched him and found drugs in Brooks's right pocket. So Officer Miller arrested Brooks.

Brooks complained to Officer Miller that "the handcuffs were to[o] tight and that he could not feel his hands." He also asked Officer Miller for medical attention "because he thought his [wrists] were broke[n] or damaged." Instead of taking Brooks for medical care, though, Officer Miller drove him to the Leon County Jail.

When Brooks arrived at the Jail, he again complained of pain. But the nurse at the Jail prescribed only Tylenol and ibu-profen.

Brooks filed grievances about these events.

In his complaint, Brooks did not allege that his wrists were, in fact, broken or damaged. Nor did he assert that he suffered any ongoing, extended, or permanent damage from the handcuffs.

### 2.  Officer Miller's Version

Officer Miller filed a probable-cause affidavit in support of his arrest of Brooks. In it, (as relevant here) he said that he saw Brooks driving a black Kia, which Brooks parked at the scene of the incident. After Brooks pulled in, he got out of the car and walked towards others who were gathered in the area.

Officer Miller then parked in the area, left his patrol car, and asked Brooks for his driver's license. Brooks answered that he

didn't have a valid license. So Officer Miller arrested him for operating a motor vehicle without a valid license.

In connection with the arrest, Officer Miller searched Brooks. In Brooks's left front jacket pocket, Officer Miller found crack cocaine. Immediately, Brooks said he didn't know that the crack was in his pocket.

Officer Miller took Brooks to the Leon County Jail "without incident," and Brooks was also charged with possession of cocaine.

### 3. The Video

As it turns out, Brooks and Officer Miller weren't the only witnesses to Brooks's arrest and transport to the Jail. Officer Miller's patrol vehicle was equipped with a dash cam that recorded at least part of the events.

The video shows another officer's patrol vehicle following a black Kia as the Kia turns into a dead-end street and parks. The Kia's door opens, and a man wearing a black and grey hoodie exits the car through the driver's door. The parties agree that that man is Brooks, though Brooks disputes he was driving the Kia. No one else leaves the car or appears to remain in it.

Brooks then walks out of view of the camera, and Officer Miller gets out of his patrol car and follows in the same direction. While both men remain outside the camera's view, Officer Miller begins to make casual conversation with what sounds like a group of people. He asks one of these individuals (who the parties agree is Brooks) whether he has a driver's license with him. Brooks

audibly responds that he does not.  So Officer Miller asks whether Brooks has a driver's license at all.  Although we can't distinctly hear Brooks's response, Officer Miller asks Brooks a couple times, "Why you ain't got a driver's license?"  Again, to the extent that Brooks answers, we can't really hear what he says.

Officer Miller then instructs Brooks to put his hands behind his back and tells Brooks, "Just relax."  We hear a very brief bit of what sounds like friction on Officer Miller's body microphone, and Officer Miller places Brooks under arrest for driving without a driver's license.

Officer Miller notices crack and a pipe on the ground and asks Brooks whether he dropped them.  Brooks denies knowing anything about them.

Then Officer Miller and Brooks, walking side by side with a few inches between them, reenter the dash cam's view.  Although Brooks is handcuffed behind his back when he reenters the dash cam's view, he does not appear to be uncomfortable or hurt in any way, and at this point, Officer Miller is not touching him.  Officer Miller directs Brooks to stand in front of Miller's car and asks Brooks whether he has anything in his pockets that Miller should know about.  Brooks responds that there's nothing that will hurt Officer Miller, and Miller calmly reaches into each of Brooks's pockets.  In Brooks's left front hoodie pocket, Officer Miller finds crack cocaine.  Brooks takes a look and says, "It damn sure is!"  But he insists that he "didn't even know that was in there."

At this point, Officer Miller tells Brooks he's under arrest for driving without a driver's license and for possession of cocaine. When Officer Miller reads Brooks his rights, Brooks indicates that he understands. Throughout the entirety of the encounter that unfolds before the dash cam, both men calmly interact with each other.

Officer Miller, another officer, and Brooks then walk in front of the patrol car and out of the dash cam's view once again. Shortly after that, we hear what sounds like a car door opening and Officer Miller and Brooks talking. About a minute later, the video screen goes black but we still hear audio. Officer Miller says he's going to take the handcuffs off so Brooks can take his jacket off, and he instructs Brooks to "please [not] try anything." The two talk some more, and Officer Miller directs Brooks to put his hands "straight up in the air" and "pull it off," presumably referring to Brooks's hoodie. Of course, these are things Brooks could not have done if he remained handcuffed at that time.

Then Officer Miller tells Brooks he is going to put the cuffs back on and says, "You've been straight-forward with us so far." He explains, "When you sit in the car—a little trick—put your hands facing that door over there, so that way your hands don't go numb. And try not to change it at all 'cause if you change it, that's gonna change up the way it's gonna feel." With that, Officer Miller directs Brooks to "have a seat," and we hear what sounds like a car door closing.

Next, we hear Officer Miller speaking with others outside the car and on the scene.

After this, Officer Miller returns to his patrol car and asks Brooks whether he dropped the pipe the officers found. Brooks denies having done so. Officer Miller goes back and speaks to others again. Then Brooks yells, "Hey, Sir!" And Officer Miller seemingly returns to Brooks. Once Officer Miller responds, Brooks pleads with him not to take him to jail. Officer Miller explains that he has no leeway because the crack offense is a felony.

After this occurs, and about sixteen minutes after the picture on the dash-cam video goes black, the video feed comes into view for about fifteen seconds, before blacking out again. At this time, Officer Miller's car is still parked at the scene. Soon after that, we hear Officer Miller on his police radio. Then Officer Miller speaks to Brooks again, explaining further that, under the governing process, he can't let Brooks go without taking him to the jail. At this point, we begin to hear what sound like driving-related noises (cars going by, possible wind sounds, and the metronome-like beating of what sounds like a car signal).

After a period of silence, Officer Miller and Brooks discuss Brooks's biographical information. Officer Miller then comments on traffic.

Officer Miller asks Brooks whether they've met before, and Miller and Brooks discuss that Miller has previously arrested Brooks for hitting Brooks's mother and possessing drugs.

As the drive continues, Officer Miller asks Brooks whether there's too much wind for him. It sounds like Brooks says no. Other than the wind and some additional announcements from Officer Miller's police radio, the recording is quiet for a few minutes. And for a fraction of a second here and there (and about two seconds at one point), the video picture returns in whole or in part.

Several more minutes pass, and Officer Miller again asks Brooks about the crack cocaine in his pocket. Although we hear Brooks's voice, we can't discern what he says. During this period, it sounds as though the car has stopped.

A few minutes later, Officer Miller asks Brooks to confirm some of his biographical information, and Brooks does. Soon after that, we hear the sounds of a car door opening and closing. Officer Miller instructs Brooks to step out and walk to a door, and the video picture returns long enough for us to catch a glimpse of what appears to be the Leon County Jail. The picture blacks out again, and a few seconds later, the recording ends.

About twenty-five minutes go by between the earliest point when Officer Miller could have been driving and the time that Miller directs Brooks to get out of the police cruiser.

At no point in the recording do we hear Brooks make sounds of pain or distress. Nor do we hear him ever complain about pain or physical distress or even hear him mention his handcuffs. In fact, all interactions that we can hear throughout the 51-minute recording sound calm and low-key.

### B.  Procedural Background

As we've mentioned, Brooks was charged with possession of cocaine and driving without a valid driver's license.  But the Leon County State Attorney's Office eventually dismissed those charges in exchange for Brooks's guilty plea in an unrelated case.

Almost two years later, Brooks, proceeding *pro se*, sued Officer Miller under 42 U.S.C. § 1983.  Brooks asserted claims for false arrest, in violation of the Fourth Amendment; excessive force, in violation of the Eighth and Fourteenth Amendments; and deliberate indifference to medical needs, in violation of the Eighth and Fourteenth Amendments.

In a nutshell, Brooks alleged in his false-arrest claim that without probable cause, Officer Miller arrested him for driving without a license and for possession of drugs, and that Miller unlawfully searched Brooks in the process.  He made a tagalong claim that Officer Miller's search of Brooks's pockets at the time of Brooks's arrest also violated Brooks's Fourth Amendment rights.  As for his excessive-force claim, Brooks contended that Officer Miller "slammed [Brooks] against his patrol vehicle [in arresting him] and hand cuff[ed] [Brooks] so tight that both hands, [wrist] and arms resulted in los[s] of circu[]lation and excruciating pain when there were no need for any violence."  And finally, in his deliberate-indifference claim, which he referred to as a denial-of-medical-care claim, Brooks alleged that he "made several request[s] that he was hurt and needed medical attention because he could not feel his

hand[] and [wrists] due to the evil intent of squeezing the handcuffs as tight as [Officer Miller] could." But, Brooks continued, Officer Miller "refuse[d] to allow [Brooks] to see any medical person[nel] and waited some time before taking [Brooks] to jail where he again [sought] medical attention."

Six months after Brooks filed his complaint, Officer Miller moved for summary judgment. He argued that he was entitled to qualified immunity because he did not violate any of Brooks's constitutional rights, and even assuming he did, any rights were not clearly established. In further support of his position, Officer Miller asserted that the dash-cam video completely contradicted Brooks's claims and showed that his allegations were false.

Soon after filing his motion for summary judgment, Officer Miller moved to stay discovery pending a ruling on his motion for summary judgment. Noting that qualified immunity is a defense not only from liability but also a "limited 'entitlement not to stand trial or face the other burdens of litigation,'" (quoting *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985)), the magistrate judge granted the motion.

Brooks objected to the entry of the stay of discovery. Among other things, Brooks sought his medical records, if any, from Leon County Jail's medical records. Brooks contended that these records would "bolster [Brooks's] description of the type and extent of his injuries" from being handcuffed by Officer Miller.

21-10590                Opinion of the Court                13

The magistrate judge denied Brooks's discovery requests without prejudice until after the court resolved Officer Miller's motion for summary judgment. That said, the magistrate judge did allow Brooks to file a response to the order, explaining why any specific discovery he sought was necessary for him to adequately respond to Officer Miller's motion for summary judgment.

Brooks filed a motion for review of the magistrate judge's order staying discovery. Upon review, the district judge overruled Brooks's objections and affirmed the magistrate judge's order.

Brooks then responded to Officer Miller's motion for summary judgment. He argued first that the video recording left genuine issues of material fact in dispute. In particular, Brooks alleged that Officer Miller had used excessive force against him outside the camera's view but that the audio portion of the recording picked up the interaction. Brooks also contended that the video portion of the recording cut out before Officer Miller tightened Brooks's handcuffs, so Officer Miller could not rely on it to prove that he hadn't tightened Brooks's handcuffs. As for Brooks's alleged pleas to loosen the handcuffs because they were hurting him, Brooks said the audio part of the recording did not pick those up because they were drowned out by Officer Miller's patrol-car radio. Finally, Brooks asserted that "clear evidence of tampering" with the dash-cam video existed. In support of this proposition, Brooks relied solely on things he observed while watching the recording itself, like the portions where the video went black.

The magistrate judge issued a report and recommendation ("R&R"), recommending that the court grant Officer Miller's motion for summary judgment. *See Brooks v. Miller*, No. 4:19-CV-00524, 2020 WL 8258414, at *8 (N.D. Fla. Dec. 21, 2020). First, the magistrate judge concluded that the video refuted Brooks's account of the events that transpired because (1) the dash-cam video showed two police cars in pursuit of a black Kia for several blocks, and Brooks was the man who exited the Kia from the driver's side; (2) the recording gave no indication that Officer Miller employed any force in arresting Brooks; (3) Officer Miller and Brooks walked towards the patrol car calmly, and Brooks had no apparent injury; and (4) Officer Miller gave Brooks instructions on how to wear the handcuffs comfortably, and Brooks never complained of pain or injury.

Then the magistrate judge determined that Brooks's false-arrest, excessive-force, and deliberate-indifference claims each failed. *Id.* at *5–*8. Starting with Brooks's false-arrest claim, the magistrate judge found that Officer Miller had probable cause to arrest Brooks for driving without a license when he saw Brooks driving and leaving the Kia and Brooks admitted he did not have a driver's license. As for Brooks's excessive-force claim, the magistrate judge viewed the dash-cam video as "refut[ing] [Brooks's] claims" that Officer Miller "slam[med]" Brooks into the car when he was arresting Brooks. But even if Officer Miller did "shove" Brooks, the magistrate judge reasoned, that action did not rise to the level of a constitutional violation because the alleged force was

de minimis.  On the deliberate-indifference claim, the magistrate judge said that Officer Miller used no force, and Brooks suffered no injury.  And even if he did use force, the magistrate judge concluded in the alternative, Brooks failed to put Officer Miller on notice of a risk of serious harm because Brooks made no complaints of "injury, pain, or discomfort" that would have alerted Officer Miller that Brooks required medical attention.  *Id.* at \*8.  Because Officer Miller violated none of Brooks's rights, the magistrate judge reasoned, Miller was entitled to qualified immunity.  *Id.*

The district judge adopted the report.  *Brooks v. Miller*, No. 4:19CV524, 2021 WL 230059, at \*1 (N.D. Fla. Jan. 22, 2021).  He then noted that Brooks's sworn complaint was testimony, so if Officer Miller's statements were the only other evidence in the record, material facts would be in dispute and the case would survive summary judgment.  But on this record, the district judge explained, the court had the benefit of the dash-cam video.  And in the district court's view, that recording discredited Brooks's allegations.  So the district court granted Officer Miller's motion for summary judgment and dismissed Brooks's case for failure to state a claim.  *Id.* at \*2.

Brooks now appeals the district court's order adopting the magistrate judge's R&R.  He also appeals the stay of discovery.

## II.    STANDARD OF REVIEW

We review the district court's grant of summary judgment de novo, viewing all evidence and drawing all reasonable factual inferences in favor of the nonmoving party—here, Brooks. *Chapman v. AI Transp.*, 229 F.3d 1012, 1023 (11th Cir. 2000) (en banc). Summary judgment is appropriate when "no genuine issues [of] material fact" exist and the law entitles the movant to judgment on the record. *Id.*; *see also* Fed. R. Civ. P. 56(a).

## III.    DISCUSSION

### A.  *The Universe of Applicable Facts*

Because the facts are everything in this appeal, we begin with them.  But before we can determine the operable facts, we must discuss *Scott*.  When opposing parties disagree about the relevant facts, *Scott* is the Supreme Court case that tells us how to identify the applicable facts for purposes of ruling on a summary-judgment motion.

In *Scott*, to end a high-speed chase, the defendant officer hit the plaintiff's car from behind, causing the plaintiff to lose control of his car and crash. *Scott*, 550 U.S. at 375.  The plaintiff sued, alleging that the officer had violated the plaintiff's Fourth Amendment right to be free from the use of excessive force. *Id.* at 376.  In support of his claim, the plaintiff said that, throughout the chase, he had remained in control of his car, slowed for turns and intersections, and used his turn signals. *Id.* at 379.  He also claimed he

hadn't run anyone off the road and wasn't a threat to pedestrians or other motorists. *Id.* But when the Court viewed a recording of the incident, it concluded that "[t]he videotape t[old] quite a different story." *Id.* In fact, the Court said, the plaintiff's "version of events [was] so utterly discredited by the record that no reasonable jury could have believed him." *Id.* at 380. For that reason, the Court held that the district court should not have relied on the "visible fiction" that was plaintiff's version of events in ruling on the officer's summary-judgment motion. *Id.* at 380–81.

As the Court explained (and as we've mentioned), "[w]hen opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Id.* at 380. Our review of *Scott* teaches us that two important requirements must be met before we can disregard the non-moving party's version of events: (1) the recording (or other evidence) must "so utterly discredit[]" the party's story "that no reasonable jury could have believed" that party, *id.*; *see also Morton v. Kirkwood*, 707 F.3d 1276, 1284 (11th Cir. 2013); *Blaylock v. City of Phila.*, 504 F.3d 405, 414 (3d Cir. 2007) (refusing to extend *Scott* to police photographs that failed to depict "all of the defendant's conduct and all of the necessary context"); and (2) there must be no evidence that the recording has been "doctored or altered," *Scott*, 550 U.S. at 378. So if a valid recording completely and clearly contradicts a party's testimony, that testimony is not credible, and the court should disregard it. *See*

*Morton*, 707 F.3d at 1284.  But if the recording renders a party's story merely unlikely yet does not necessarily contradict it, the default rule kicks in:  we must accept the party's version for purposes of considering the motion for summary judgment.

Applying *Scott*'s rule here, we conclude that the material facts for purposes of summary judgment are as follows[1]:

Officer Miller followed the Kia until it stopped on a dead-end road.  When the Kia parked, Brooks got out of the driver's seat.  No one else appeared to be in the car.

Soon after Brooks left the Kia, Officer Miller walked over to a group of people where Brooks was standing and asked Brooks whether he had a license.  Brooks said he did not.  So Officer Miller arrested Brooks for driving without a license.  We must use this universe of facts because the video recording "so utterly

---

[1] Brooks asserts that the video recording was tampered with.  We need not address that because his allegations of tampering apply to only the parts of the recording dealing with Brooks's excessive-force and deliberate-indifference claims, and we reverse the entry of summary judgment on the excessive-force claim and don't rely on the recording to affirm the entry of summary judgment on the deliberate-indifference claim.  As for Brooks's false-arrest claim, Brooks agrees that the recording accurately represents the events from the time that it began through at least when Officer Miller arrested Brooks for driving without a license.  Indeed, Brooks himself relies on that part of the recording in advocating for reversal of summary judgment on the false-arrest claim.  And that is what we rely upon as well in our analysis of that claim.

discredit[s]" Brooks's version of this part of the story that "no reasonable jury could . . . believe[] him," *Scott*, 550 U.S. at 380.

As for the arrest itself, that occurred outside the camera's view. So we can't see Officer Miller "grab[bing] [Brooks] by the shirt and slam[ming] him into the patrol vehicle," as Brooks alleged. But during the arrest, we can hear what sounds like friction on Officer Miller's microphone. We can't say that sound is Officer Miller slamming Brooks against the patrol car, but we also can't rule out the possibility because the friction obscures the audio. To be sure, when we see Brooks walking with Officer Miller to Miller's patrol car soon after we hear the friction, Brooks does not appear at all hurt. But it's not necessarily the case that we would have been able to see any injuries slamming Brooks against the car to arrest him might have caused. The long and short of these circumstances is that the recording doesn't preclude the possibility that a reasonable juror could conclude that Officer Miller "grab[bed] [Brooks] by the shirt and slam[med] him into the patrol vehicle" when Officer Miller arrested Brooks. So we accept that version of the story for purposes of reviewing the summary-judgment order.

Next, we consider the facts as they relate to Brooks's claims that Officer Miller overtightened Brooks's handcuffs and ignored his pleas for assistance. Again, nearly all Brooks's time in handcuffs occurred outside the camera's view (not to mention, the video picture was also black for most of that time). Add to that the fact that we can't clearly distinguish Brooks's statements while sitting in the police cruiser. And again, we must conclude that we can't rule out

the possibility that a reasonable juror could find that Brooks complained about the tightness of the handcuffs and Officer Miller did not respond.  Even if, given the rest of the recording, we might not reach that conclusion, the bottom line is that the recording does not "so utterly discredit" Brooks's version of this part of the story that "no reasonable jury could . . . believe[] him." *Id.*  So for purposes of reviewing the summary-judgment order, we accept Brooks's claims that Officer Miller overtightened the handcuffs and did not respond to Brooks's complaints while they rode to the Leon County Jail, and that his hands and wrists were numb and hurt.

Now that we've identified the relevant facts, we turn to the legal analysis.

### B.  Qualified Immunity

Qualified immunity shields government employees from suit in their individual capacities for discretionary actions they perform while going about their duties.  The thought behind the doctrine is the "balanc[ing of] two important public interests: 'the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably.'" *Davis v. Waller*, 44 F.4th 1305, 1312 (11th Cir. 2022) (quoting *Pearson v. Callahan*, 555 U.S. 223, 231 (2009)).  Under the balance that qualified immunity strikes, "all but the plainly incompetent or those who knowingly violate the law" enjoy its protection.  *Malley v. Briggs*, 475 U.S. 335, 341 (1986).

To determine whether qualified immunity applies, we engage in a burden-shifting analysis. *See Lee v. Ferraro*, 284 F.3d 1188, 1194 (11th Cir. 2002). At the first step, the public-employee defendant must show that he was acting within the scope of his discretionary authority when he committed the challenged acts. Once the defendant does that, the burden shifts to the plaintiff, who must show that qualified immunity is not appropriate. *Id.* To do that, the plaintiff must establish two things: (1) the defendant violated a constitutional right, and (2) that constitutional right was "clearly established" at the time of the defendant's actions. *Powell v. Snook*, 25 F.4th 912, 920 (11th Cir. 2022).

A plaintiff can show that a violation is "clearly established" in any of three ways: (1) by relying on a "materially similar decision of the Supreme Court, of this Court, or of the supreme court of the state in which the case arose;" (2) by invoking "'a broader, clearly established principle [that] control[s] the novel facts' of the case;" or (3) by persuading us that the officer's acts "so obviously violate[] th[e] [C]onstitution that prior case law is unnecessary." *Id.* (citation omitted) (fourth alteration in original; other alterations added). If a plaintiff proceeds under the first or second method, he must point to a court decision. *Id.* The second and third methods require "obvious clarity." *Id.* That is, the principle must be so apparent that, even without a case with similar facts to light the way, any competent officer would know that his conduct crossed the line. *See id.* In sum, the "clearly established" part of the qualified-immunity inquiry asks whether the law when the officer engaged in the

challenged conduct gave him "'fair warning' that his conduct was unlawful." *Id.* at 921 (citation omitted).

Courts have "discretion to decide which of the two prongs of [the] qualified-immunity analysis to tackle first." *Ashcroft v. al-Kidd*, 563 U.S. 731, 735 (2011). And since a plaintiff must show both prongs to overcome qualified immunity, if the prong the court considers first is not satisfied, the court need not consider the other prong because the officer is entitled to qualified immunity, regardless. *Pearson*, 555 U.S. at 236.

Here, the parties agree that Officer Miller acted within his discretionary authority during the alleged conduct Brooks challenges. For that reason, we turn to the questions of whether the alleged conduct violated Brooks's rights and whether, at the time of the alleged violations, the law was clearly established.

1. Officer Miller had probable cause to arrest Brooks and properly searched Brooks's pockets incident to Brooks's arrest.

We begin by addressing Brooks's claim that Officer Miller violated his Fourth Amendment rights by falsely arresting him. Brooks asserts that Officer Miller lacked probable cause to arrest him for two reasons: (1) because Brooks never conceded to driving the black Kia, and (2) because even if Brooks drove the Kia, "driving without a valid license is a non-criminal traffic infraction for which

one cannot be arrested."[2]  Appellant's Br. at 13.  Both reasons lack merit.

To be sure, a warrantless arrest without the existence of probable cause violates the Fourth Amendment and forms a basis for a § 1983 claim.  *See Ortega v. Christian*, 85 F.3d 1521, 1525 (11th Cir. 1996); *see also Redd v. City of Enterprise*, 140 F.3d 1378, 1382 (11th Cir. 1998).  To succeed on a false-arrest claim, a plaintiff must establish (1) a lack of probable cause and (2) an arrest.  *See Richmond v. Badia*, 47 F.4th 1172, 1180 (11th Cir. 2022).  Probable cause exists when "a reasonable officer could conclude . . . that there [is] a substantial chance of criminal activity."  *Washington v. Howard*,

---

[2] Brooks also argues that when Officer Miller approached Brooks and asked whether he had a license, that was pretextual because Miller was allegedly there investigating possible drug crimes.  But Brooks, who was not detained, voluntarily answered Officer Miller's question about whether Brooks had a license.  *See United States v. Drayton*, 536 U.S. 194, 200–201 (2002) ("Law enforcement officers do not violate the Fourth Amendment's prohibition of unreasonable seizures merely by approaching individuals on the street or in other public places and putting questions to them if they are willing to listen . . . Even when law enforcement officers have no basis for suspecting a particular individual, they may . . . ask for identification . . . provided they do not induce cooperation by coercive means.").  *See also United States v. Caraballo*, 595 F.3d 1214, 1223 (11th Cir. 2010) ("Law enforcement officers do not violate the Fourth Amendment simply by approaching an individual on the street or in some other public place and asking a question or asking for identification.").  Because Brooks said he did not have a license and the video shows Brooks driving, Officer Miller had probable cause to arrest Brooks for driving without a license, regardless of what Officer Miller was investigating before Brooks's arrest.  *See Whren v. United States*, 517 U.S. 806, 813 (1996).

25 F.4th 891, 902 (11th Cir. 2022) (quotation omitted).  And probable cause is an "absolute bar" to a § 1983 false-arrest claim.  *Rankin v. Evans*, 133 F.3d 1425, 1435 (11th Cir. 1998).

The problem for Brooks is that the record undoubtedly reflects that Officer Miller had probable cause to arrest Brooks for driving without a license.

First, as we've noted, the video recording clearly shows Brooks exited the driver's door of the Kia immediately after the car was parked.  And Brooks was the only one to leave the car.  Because Brooks's claim that he was not driving the Kia is "blatantly contradicted by the record, so that no reasonable jury could believe it," *Scott*, 550 U.S. at 380, the district court correctly dismissed his attestations to that effect and concluded that Brooks was driving the Kia.

Second, probable cause supports the arrest.  Besides the fact that Brooks was driving the Kia, the recording shows that after Brooks left the car, Officer Miller walked over to a group where Brooks was standing.  And we hear a microphoned Officer Miller, who, at that point, was not in view of the camera, ask Brooks whether he has a driver's license with him.  Brooks admitted that he did not.  Officer Miller then repeatedly asked Brooks why he didn't have a driver's license.  And when Brooks didn't answer, Officer Miller arrested Brooks for driving without a license.

Florida Statutes § 322.03(1) makes it a misdemeanor for any person to operate a car without a driver's license.  So given that

Officer Miller saw Brooks driving the Kia without a license and that Brooks admitted he had no license, Officer Miller had probable cause to arrest Brooks for violating that law.  Indeed, "[i]f an officer has probable cause to believe that an individual has committed even a very minor criminal offense in his presence, he may, without violating the Fourth Amendment, arrest the offender." *Atwater v. City of Lago Vista*, 532 U.S. 318, 354 (2001).

And because Officer Miller's arrest of Brooks was lawful, the search Officer Miller conducted of Brooks's pockets incident to that arrest was also lawful. *See Davis v. United States*, 564 U.S. 229, 232 (2011).

2. <u>Brooks's excessive-force claim that Officer Miller slammed him into the car and overtightened his handcuffs survives summary judgment.</u>

Next, Brooks argues that Officer Miller used excessive force in violation of the Fourth Amendment when Miller allegedly "slam[med]" Brooks into the car at the time of the arrest and "overtightened Brooks's handcuffs, causing "excruciating pain" and numbness, and refused to adjust the cuffs.  As we've explained, these events do not appear in the video of the recording.  And based on the audio portion, we can't rule out the possibility that Officer Miller "slam[med]" Brooks into the patrol car when he arrested him.  Nor can we say with certainty that Brooks did not complain to Officer Miller that his handcuffs were too tight and were causing him pain and numbness.  Given these facts that we must accept for purposes of considering Officer Miller's summary-judgment

motion, we conclude that summary judgment is not appropriate on Brooks's excessive-force claim.

"[T]he right to make an arrest . . . necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it." *Graham v. Connor*, 490 U.S. 386, 396 (1989). But the Fourth Amendment guarantees the right to be free from the use of excessive force during an arrest.[3] *Saunders v. Duke*, 766 F.3d 1262, 1266–67 (11th Cir. 2014). Under the Fourth Amendment, we evaluate whether force is excessive by applying an objective reasonableness standard. *See Graham*, 490 U.S. at 395–96. That is, we ask "whether the officer's conduct is objectively reasonable in light of the facts confronting the officer." *Vinyard v. Wilson*, 311 F.3d 1340, 1347 (11th Cir. 2002). This inquiry requires us to balance the "nature and quality" of the acts on the individual against the government's justification for using force. *Graham*, 490 U.S. at 396. In making this assessment, we employ "the perspective of a reasonable officer on the scene, rather than . . . 20/20 . . . hindsight."

---

[3] Brooks asserted in the district court that Officer Miller's alleged use of excessive force violated Brooks's Eighth Amendment rights. But Brooks was not in prison at the time of the events here. And we evaluate a "free citizen's claim that law enforcement officials used excessive force in the course of making an arrest" under the Fourth Amendment's "objective reasonableness standard." *Graham*, 490 U.S. at 388. We apply Eighth Amendment case law when an incarcerated person alleges excessive force. *See Wilkins v. Gaddy*, 559 U.S. 34, 35–38 (2010).

*Kesinger ex rel. Estate of Kesinger v. Herrington*, 381 F.3d 1243, 1248 (11th Cir. 2004).

Our cases identify some non-exclusive factors that help us assess whether an officer's use of force was objectively reasonable: (1) how severe the underlying crime was; (2) the type of threat, if any, a suspect presented to the safety of the officers or others; and (3) "whether [the suspect] actively resist[ed] arrest or attempt[ed] to evade arrest by flight." *Cantu v. City of Dothan*, 974 F.3d 1217, 1229 (11th Cir. 2020) (quoting *Graham*, 490 U.S. at 396). We've recognized that "[n]onviolent misdemeanors are crimes of minor severity for which less force is generally appropriate." *United States v. Brown*, 934 F.3d 1278, 1295 (11th Cir. 2019) (cleaned up).

When we apply these factors to the facts we've identified for summary-judgment purposes, we conclude that Brooks's excessive-force claims survive. First, Officer Miller arrested Brooks for the misdemeanor crime of driving without a license. We can't say that this crime "rise[s] to the level of criminal conduct that should have required the use of force." *Stephens v. DeGiovanni*, 852 F.3d 1298, 1322 (11th Cir. 2017). Second, no evidence so much as suggests that Brooks posed any threat to Officer Miller or anyone else. In fact, Officer Miller's probable-cause affidavit expressly notes that the "arrest was without incident." And third, Brooks neither resisted arrest nor tried to flee.

Under these circumstances, it was objectively unreasonable to "slam[]" Brooks into the car while arresting him. Similarly, it was objectively unreasonable for Officer Miller to *unnecessarily*

overtighten Brooks's handcuffs as part of this same arrest and refuse to make any adjustments when Brooks complained of numbness and "excruciating pain." So if these events occurred, they violated Brooks's Fourth Amendment rights.

Brooks's right to be free from the use of this type of excessive force was also clearly established when Officer Miller arrested him on November 12, 2016. In *Lee v. Ferraro*, a plaintiff alleged that the defendant officer slammed her head onto the car when he arrested her for improperly honking her horn. 284 F.3d at 1191. Under her version of the facts, the plaintiff posed no risk to anyone and she did not attempt to resist or flee. *Id.* at 1198. We said that, in those circumstances, it was "abundantly clear . . . that [the officer] used force that was plainly excessive, wholly unnecessary, and, indeed, grossly disproportionate . . . ." *Id.*

We think *Lee* provides clear guidance to officers that they use excessive force if they slam a person into a car during an arrest for a relatively minor offense when the suspect does not endanger anyone else, does not resist, and does not attempt to escape. And if an officer cannot slam a person into a car under these circumstances, the officer certainly cannot engage in additional unnecessary force, such as gratuitously overtightening handcuffs and refusing to adjust them in response to complaints of "excruciating pain" followed by numbness. For these reasons we conclude that, under the facts viewed in the light most favorable to Brooks as the nonmoving party, Officer Miller is not entitled to qualified immunity

on the excessive-force claim that he "slam[med]" Brooks into the car and unnecessarily overtightened Brooks's handcuffs.

Because we hold that Officer Miller is not entitled to qualified immunity on Brooks's excessive-force claim at the summary-judgment stage, we direct the district court to remove the stay on discovery as it pertains to this claim and to reconsider Brooks's request for his medical records from the Leon County Jail.

3.  The district court properly granted summary judgment on Brooks's deliberate-indifference claim.

That leaves Brooks's other handcuff-related claim: that Officer Miller was deliberately indifferent to Brooks's alleged serious medical needs arising from his being handcuffed too tightly. But unlike with the excessive-force claim, we conclude that the district court properly found that Officer Miller was entitled to qualified immunity on this claim.

We begin with the facts. As we've mentioned, at no point during any of the audio portion of the recording can we hear Brooks complain about pain or numbness from the handcuffs. But during the car ride, the recording includes some portions of garbled audio that preclude us from ruling out the possibility that Brooks complained at some point about pain and numbness from the cuffs. Besides that, Brooks alleges that Officer Miller turned up the radio to cover up Brooks's complaints of injury. And we do hear the radio in portions of the recording.

So while we can't hear Brooks complain about the cuffs, the audio does not "blatantly contradict[]" Brooks's version of events. Because the audio offers only some support for Officer Miller's version of the incident, we must accept Brooks's allegations for purposes of ruling on the summary-judgment motion. As a result, we assume that Brooks complained to Officer Miller during the car ride that the handcuffs were too tight and they were making his wrists and hands numb.

As for the substance of Brooks's deliberate-indifference claim, the Due Process Clause of the Fourteenth Amendment requires government officials to provide medical care to those who've been injured during arrest. *City of Revere v. Mass. Gen. Hosp.*, 463 U.S. 239, 244 (1983). To prevail on a § 1983 claim alleging a violation of that right, a plaintiff "must satisfy both an objective and a subjective inquiry." *Bozeman v. Orum*, 422 F.3d 1265, 1272 (11th Cir. 2005) (internal quotation marks omitted).

First, a plaintiff must first establish the existence of an objectively serious medical need. *Id.* A "serious medical need" is "one that has been diagnosed by a physician as mandating treatment or one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention." *Kuhne v. Fla. Dep't of Corr.*, 745 F.3d 1091, 1096 (11th Cir. 2014). Or a serious medical need can exist if a delay in treating the need exacerbates the condition. *Mann v. Taser Int'l, Inc.*, 588 F.3d 1291, 1307 (11th Cir. 2009). But in either scenario, the need "must be one that, if left unattended, pos[es]

a substantial risk of serious harm." *Farrow v. West*, 320 F.3d 1235, 1243 (11th Cir. 2003) (citation and quotation marks omitted).

Second, as to the subjective inquiry, the plaintiff must prove that the officers were deliberately indifferent to his serious medical need. *Id.* More specifically, the plaintiff must present evidence that would allow a reasonable jury to conclude that (1) the officer knew facts that should have allowed him to draw the inference that a substantial risk of serious harm existed; (2) the officer actually drew that inference; (3) the officer nonetheless disregarded the risk of serious harm; and (4) the officer's conduct amounted to more than negligence of a specified degree.[4]

The district court concluded that Officer Miller was entitled to qualified immunity on this claim. As we've explained, to overcome qualified immunity, a plaintiff must show that the officer "violated a statutory or constitutional right" that "was clearly established" at the time of his challenged conduct. *Ashcroft*, 563 U.S. at 735.

---

[4] As of the time we issue this opinion, arguably, some uncertainty exists in our precedent as to whether the standard is "more than mere negligence" or "more than gross negligence." *Compare, e.g.*, *Adams v. Poag*, 61 F.3d 1537 (11th Cir. 1995), *and Townsend v. Jefferson Cnty.*, 601 F.3d 1152 (11th Cir. 2010). Luckily for us, we need not wade further into this sticky wicket here because, as our analysis of Brooks's claim shows, it makes no difference whether the standard is "mere" or "gross."

On Brooks's deliberate-indifference claim, we start with the "clearly established" prong because it resolves the question of qualified immunity. In determining whether Officer Miller violated a clearly established constitutional right, we must focus on the specific facts and context of this case. *See Perez v. Suszczynski*, 809 F.3d 1213, 1218 (11th Cir. 2016). So we ask whether, when Officer Miller transported Brooks to the Jail on November 12, 2016, it was clearly established that an officer acted with deliberate indifference to a transported person's complaints that his handcuffs were causing numbness and injury, if he drove about twenty-five minutes to a jail where the transported person could receive medical attention, instead of stopping on the road or driving to a nearby hospital for medical assistance. We conclude that, even if these facts state a constitutional violation, any such violation was not clearly established when Officer Miller transported Brooks.

To support the opposite conclusion, Brooks relies on case law that establishes the general proposition that if an officer "actually know[s] about a condition that poses a substantial risk of serious harm and yet do[es] *nothing* to address it, [he] violate[s] the Constitution." Appellant's Supp. Br. at 34 (quoting *Patel v. Lanier Cnty.*, 969 F.3d 1173, 1190 (11th Cir. 2020)). And to be sure, *Patel* states the general rule. But that case does not get to the heart of the allegations here.

Even assuming without deciding that Brooks had a serious medical need, the general principle Brooks relies on does not provide clear notice to a reasonable officer in Officer Miller's position.

It does nothing to clarify whether driving about twenty-five minutes for medical attention in response to an arrestee's statement that handcuffs are too tight, instead of stopping roadside to provide medical attention or finding a hospital and obtaining care in a local emergency room, would violate a detainee's rights. And we do not see how *Patel*'s general principle would have provided Officer Miller with "'fair warning' that his conduct was unlawful." *Powell*, 25 F.4th at 921. Because Brooks failed to point to any precedent or a generally established rule that would give Officer Miller fair warning that his specific conduct was unconstitutional, Officer Miller is entitled to qualified immunity on Brooks's claim for deliberate indifference to a serious medical need.

## IV.    CONCLUSION

We affirm the district court's grant of Officer Miller's motion for summary judgment on Brooks's false-arrest and deliberate-indifference claims, and we reverse the district court's summary-judgment ruling on Brooks's excessive-force claim. So we remand the case to the district court for further proceedings consistent with this opinion.

**AFFIRMED IN PART; REVERSED AND REMANDED IN PART.**

JORDAN, Circuit Judge, Concurring:

When it comes to matters of technology and science, the courts frequently lag behind society.  *See* John G. Roberts, *2014 Year-End Report on the Federal Judiciary*, United States Supreme Court, at 3, (Dec. 31, 2014) ("[T]he courts will often choose to be late to the harvest of American ingenuity."); Lillian R. BeVier, *The Communications Assistance for Law Enforcement Act of 1994: A Surprising Sequel to the Break Up of AT&T*, 51 Stan. L. Rev. 1049, 1061–62 (1999) ("For many reasons, the pace of legal change can never keep up with the pace of technological evolution.").  And that reality is probably more true today than in years past given the current pace of technological innovation.

In a world of artificial intelligence, video and picture editing software, and video and image generators—to only name a few—we must "tread carefully . . . to ensure that we do not 'embarrass the future'" when assessing video footage like the dash-cam recording in this case.  *See Carpenter v. United States*, 138 S. Ct. 2206, 2220 (2018) (quoting *Northwest Airlines, Inc. v. Minnesota*, 322 U.S. 292, 300 (1944)).  To "keep pace with the inexorable march of technological progress," *United States v. Warshak*, 631 F.3d 266, 285 (6th Cir. 2010), we must be confident that a video or photograph is truly what it purports to be before accepting it as gospel. Some of today's smart phones, like the Google Pixel—with its "Magic Eraser" feature—can edit or erase persons and objects from photographs with a couple of clicks and replace them with AI-generated imagery that fills the gap.  Similar technology, I am sure,

will likely soon be available for the editing of videos.  Indeed, there are reports that the next version of "Magic Eraser" will allow users of Google Pixel phones to remove audio (like background noise) from videos.  *See* Brad Linder, *Audio Magic Eraser Feature May Debut With the Google Pixel 8* (Liliputing - August 12, 2023).

Mr. Brooks asserts that the dash-cam recording was tampered with.  That may or may not be true.  But, as the court's opinion explains, we need not decide the matter.  The tampering allegations apply only to the parts of the recording relating to Mr. Brooks' excessive-force and deliberate-indifference claims, and "we reverse the entry of summary judgment on the excessive-force claim and don't rely on the recording to affirm the entry of summary judgment on the deliberate-indifference claim."  Maj. Op. at 18 n.1.

With these thoughts, I join Judge Rosenbaum's opinion for the court in full.