**NOT FOR PUBLICATION**

In the

United States Court of Appeals

For the Eleventh Circuit

————————————

No. 24-13195

Non-Argument Calendar

————————————

MARTINEZZ BOWMAN,

*Plaintiff-Appellant,*

*versus*

SHERIFF OF COLUMBIA COUNTY
SHERIFF'S OFFICE, et al.,

*Defendants,*

DAVID HARVEY,
JAYME GOHDE,

*Defendants-Appellees.*

————————————

Appeal from the United States District Court
for the Middle District of Florida
D.C. Docket No. 3:22-cv-00545-MMH-MCR

————————————

Before JILL PRYOR, BRANCH, and BRASHER, Circuit Judges.

PER CURIAM:

Martinezz Bowman appeals from the district court's order granting summary judgment on the basis of qualified immunity to defendants Deputy David Harvey and Deputy Jayme Gohde on Bowman's claims for excessive force and malicious prosecution under 42 U.S.C. § 1983.[1] Bowman argues that (1) the district court failed to view the evidence in the light most favorable to him, demonstrated bias against him and improperly applied *Scott v. Harris*, 550 U.S. 372, 380 (2007), to discredit his version of events;[2] (2) Deputy Harvey's deployment of K-9 Drago and the duration of Drago's attack constituted excessive force, and Deputy Gohde had a duty to intervene to stop the use of excessive force; and (3) he was entitled to relief on his malicious prosecution claim because

---

[1] Bowman initially also named Sheriff Mark Hunter, in his official capacity, as a defendant and brought claims for municipal liability, negligence under Florida law, and unlawful arrest under Florida law against him. However, these claims were dismissed at the motion-to-dismiss stage. Similarly, the district court also dismissed claims for false arrest and negligence and unlawful detention/arrest under Florida law against Deputy Harvey and Deputy Gohde at the motion-to-dismiss stage and later declined to exercise supplemental jurisdiction over claims for state law battery against Deputy Harvey and Deputy Gohde. Because Bowman does not challenge any of these rulings on appeal, we do not address those claims.

[2] This argument is inextricably intertwined with the merits of Bowman's claims. Therefore, we address it as necessary throughout this opinion in discussing the facts and the merits of Bowman's claims and not as a separate issue.

Deputy Harvey lacked probable cause to arrest Bowman for fleeing and eluding.  After careful review, we affirm.

## I.    Background

The events giving rise to this § 1983 action occurred over an approximately five-and-a-half-minute period on the night of October 23, 2020, in Florida.  Viewing the evidence in the light most favorable to Bowman,[3] the facts are as follows.  Deputy David Harvey, his police canine Drago, and Deputy Trainee Jayme Gohde were patrolling Columbia County, Florida, in an official, marked police vehicle.  While sitting at an intersection of a side street and U.S. Route 441 ("441"), the officers observed a white Dodge Charger pass by them without taillights on.[4]  Bowman was driving the Charger, and he had two friends with him.  However, due to the vehicle's window tint, the officers could not see the driver or whether there were any passengers in the vehicle.

Deputy Harvey pulled out onto 441, caught up to the Charger, and activated the lights on his police car as the Charger entered a center turning lane and prepared to turn left onto a side

---

[3] "We review a district court's grant of summary judgment *de novo*, view[ing] the evidence in the light most favorable to the non-moving party."  *Gogel v. Kia Motors Mfg. of Ga., Inc.*, 967 F.3d 1121, 1134 (11th Cir. 2020) (*en banc*) (quotation omitted).

[4] Dashcam footage conclusively establishes that 441 is a major road in Columbia County and very well-lit.

street, Gerson Lane.[5]   The Charger did not stop.   Instead, it proceeded to turn left onto Gerson Lane.   Unbeknownst to the officers, Bowman lived on Gerson Lane.[6]

---

[5] Bowman's counsel makes much of the fact that there is no evidence that Bowman noticed the officers' lights when he was on 441 and maintains that Bowman only noticed them after he was on Gerson Lane, and he faults the district court for not crediting Bowman's version of events (or at a minimum allowing a jury to "weigh" his testimony).   The district court, however, did not find that Bowman "saw" the police lights when he was on 441.   Rather, the district court found as a matter of fact that, based on the dashcam video, Officer Harvey activated his lights while Bowman was still on 441, and then Bowman made a left-hand turn onto Gerson.   The district court also expressly found that the officers did not dispute when Bowman may or may not have "noticed" the lights.

Regardless, even if there was a dispute about whether Bowman noticed the lights while he was on 441 or as he was turning onto Gerson Lane, the dispute is not material to the qualified immunity issue.   *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) ("Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment.   Factual disputes that are irrelevant or unnecessary will not be counted.").   Bowman does not dispute that, by the time he turned on onto Gerson Lane, he saw the lights and he did not stop. Instead, he continued traveling down Gerson for at least half a mile, and it is this action and the police encounter with Bowman after he stopped that is key to the qualified immunity inquiry in this case.

[6] Bowman asserts that "a simple check of the vehicle tag" would have put the officers on notice that the car was registered to a home nearby.   Presumably, according to Bowman, if the officers had known that the car was registered nearby, they would have understood that he was not fleeing and eluding when he failed to stop, but was simply trying to get to a safe location to stop (*i.e.*, his house).   We categorically reject such a contention.   Even if an officer knows that a car is registered nearby, the officer is not required to assume that an unknown driver is headed to the registered location.   To be clear, when an

24-13195                 Opinion of the Court                 5

The officers followed the Charger onto Gerson Lane and immediately activated the police sirens to accompany the flashing lights.  The Charger did not stop; instead, it continued driving at a normal rate of speed down Gerson Lane for at least 45 seconds[7] (about a half-mile according to Bowman) before initiating a left turn signal and turning into a trailer park.[8]  The dashcam footage established that there were no other cars on Gerson Lane at the time and the road was poorly lit.  The footage also showed

---

officer initiates lights and sirens to effectuate a stop, a driver should promptly stop (even if they just so happen to live nearby).  If the driver fails to stop and continues driving, it is entirely reasonable for an officer to conclude that the driver is attempting to flee and elude the officer.

[7] Bowman testified in his deposition that it was approximately 15 seconds to his house.  However, the dashcam video confirms that it was in fact 45 seconds.

[8] Bowman takes issue with the district court's characterization of his home as a trailer park, noting that he "never used those words" to describe his home.  He contends that the use of the term "trailer park" and its description as "poorly lit" "casts unnecessary dispersions [*sic*] on the facts of the case and [was] designed to convey danger or judgment where it is entirely inappropriate."  Bowman's argument is frivolous.  The district court made a factual statement based on the dashcam video which was necessary to provide context for the facts and circumstances confronting the officers.  The district court's factual description of the area where Bowman pulled off the road and stopped the vehicle did not "cast[] unnecessary [aspersions] on the facts of the case."  Nor does the court's description demonstrate any bias against Bowman.

numerous places along Gerson Lane where Bowman could have pulled over.[9]

Once the Charger stopped at the trailer park, Deputy Harvey and Deputy Gohde exited the police cruiser with their guns drawn.[10] At this point, Deputy Harvey's dashcam was no longer in a position to capture video of what transpired, but the dashcam did capture audio of the interaction between Bowman and the officers.

Deputy Harvey immediately yelled "driver stop," "stop right now, "put your hands out the window," "do not move," and "do you understand me?" Bowman can be heard shouting back "what you mad for" and "you going to shoot me?" Deputy Harvey continued to yell "driver stop," "put your hands out the window," and "do you understand me." In response, Bowman repeatedly asked, "are you going to shoot me." Deputy Harvey then told Deputy Gohde to call for backup. Deputy Harvey continued to yell, "keep your hands where I can see them," and Bowman yelled

---

[9] Bowman disputes that he could have stopped on Gerson Lane because it was a two-lane road "with approximately one street light" that was "lined with ditches or trenches on both sides." Even accepting Bowman's characterization of the road, nothing prevented Bowman from stopping on the roadway. Indeed, such an action is common in traffic stops. Regardless, the dashcam footage conclusively established that there were places where Bowman could have safely pulled over to the side of Gerson Lane.

[10] Deputy Harvey stated in a sworn declaration that he had his taser drawn, not a gun. However, Bowman testified in his deposition that both of the deputies had their guns drawn. Because we cannot see Deputy Harvey on video and we must view the evidence in the light most favorable to Bowman, we accept Bowman's contention that Deputy Harvey also had his gun drawn.

24-13195                Opinion of the Court                7

back, "you see my hands, don't you."  Bowman also repeatedly yelled "someone record this shit," and his passengers can be heard telling Bowman to "put your hands up."

Deputy Harvey then directed Bowman to "step out of the vehicle, slowly."  Bowman responded, "are you not going to shoot me," and Deputy Harvey repeated his directive for Bowman to step out of the vehicle.  Bowman responded, "bro, you're not going to shoot me, bro."  Deputy Harvey again called out for Bowman to "step out of the vehicle slowly," and Bowman responded, "listen to me bro," and "come get me, bro."  Deputy Harvey then yelled "Driver, I will release my dog if you do not step out of the vehicle."[11]

Bowman then yelled "big bro, this my house, bro, you not going to shoot me bro.  This is my house right here, big bro.  You

---

[11] Bowman testified in his deposition (and maintains on appeal) that he promptly obeyed Deputy Harvey's commands to show his hands, to not move, and to get out of the car, admitting only that he did not obey Deputy Harvey's subsequent commands after he exited the car.  However, the audio from the dashcam footage utterly discredits Bowman's contention that he complied with Deputy Harvey's initial commands.  "When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it," we do not adopt that version of the facts even at the summary judgment stage.  *Scott v. Harris*, 550 U.S. 372, 380 (2007); *see also Brooks v. Miller*, 78 F.4th 1267, 1271 (11th Cir. 2023) ("*Scott* stands for the commonsense proposition that when a video proves that the plaintiff can't be telling the truth, we don't accept the facts as he alleges them, even for purposes of deciding a summary-judgment motion.").  Accordingly, we do not accept Bowman's version of events concerning his compliance with Deputy Harvey's commands.

not going to shoot me, bro." Bowman continued shouting, "you got the red beams on me, for what. What you got a gun on me for? Why you got a gun pointed at me, bro. That's disrespectful, bro." Deputy Harvey retrieved Drago from the police cruiser, and yelled "Last warning, Sheriff's Dog K-9." Bowman asked, "you want me to get out?"

Bowman then exited the vehicle, and Deputy Harvey can be heard yelling "you better stop. Stay right there. Turn around and face away from me now." Bowman responded, "for what, bro?" Deputy Harvey stated, "I will release this dog if you do not." Bowman stated "release the dog, bro." Deputy Harvey again directed Bowman to "put your hands up. Turn around and face the other way. Now. Slowly. I said slowly. Back towards me. Do not face me; face the other way." Bowman refused, stating "I'm not moving towards you." Deputy Harvey again told Bowman "do not face me. Turn around and face the other way. Last warning." At that point, Deputy Harvey released Drago.[12]

---

[12] Bowman also contends that Drago is only supposed to apprehend and bite on a single command word "Packen," which Deputy Harvey did not say. Instead, Bowman contends that Deputy Harvey said "Nein, Nein, Nein,"—allegedly the word the dog understands as "no," and that Drago had to be pulled off of Bowman with "a bite stick." Bowman contends these facts demonstrate "a lack of training" and that Drago was "tantamount to a gun being allowed to fire with no trigger pull." However, there is no failure-to-train claim on appeal, and Bowman does not explain how these allegations are material to his excessive force claim. *Anderson*, 477 U.S. at 248 ("[T]he substantive law will identify which facts are material. . . . Factual disputes that

Once Drago was deployed, Bowman attempted to climb on the hood of his car to avoid the dog. Drago bit Bowman's right leg, and Bowman fell off the car and onto the ground. Bowman testified that he struggled to try and stand up to get away from the dog. For approximately one minute, the dashcam audio captured Bowman repeatedly yelling "oh my God"; "help me"; "get your dog, bro"; "help"; "my leg"; and "I'm sorry, bro, get your dog, bro." During this time, Deputy Harvey approached Bowman and ordered him to put his hands behind his back. Bowman did not comply, and Deputy Harvey put his knee in Bowman's back and handcuffed him before removing Drago. The video does not capture when Deputy Harvey removed Drago from Bowman's leg, but roughly two minutes and twelve seconds elapsed between when the dashcam audio established that Deputy Harvey released K-9 Drago and when the video captured Deputy Harvey returning Drago to the police cruiser.

Bowman refused treatment from the paramedics, was transported to a local hospital, and again refused treatment.

At some point, Deputy Harvey prepared and signed a warrant affidavit stating that Bowman had been driving under the influence,[13] fleeing or attempting to elude a law enforcement

---

are irrelevant or unnecessary will not be counted."). Accordingly, we do not consider these non-material facts.

[13] Deputy Harvey indicated in the warrant affidavit that, during his contact with Bowman, he "detected the odor of [an] alcoholic beverage emitting from his breath" and an "odor of marijuana emitting from the vehicle. [And] [a]fter seeing [Bowman's] actions it was suspected he was possibly intoxicated."

officer, and obstructing without violence.  Deputy Harvey also issued Bowman a warning for having inoperable taillights.  The state attorney's office pursued only the fleeing and eluding charge for "willful refusal/failure to stop."  A Florida jury later acquitted Bowman on this charge.

As relevant to this appeal, Bowman thereafter filed a § 1983 complaint against Deputies Harvey and Gohde, alleging claims of (1) excessive force (Count 1 against Deputy Harvey and Count 2 against Deputy Gohde), and (2) malicious prosecution (Count 9 against Deputy Harvey).  In Count 1, Bowman alleged that Deputy Harvey violated Bowman's right to be free from excessive force under the Fourth and Fourteenth Amendments when Deputy Harvey retrieved K-9 Drago and allowed Drago to "maul Bowman until he was handcuffed despite Bowman being under their complete control."  Relatedly, in Count 2, Bowman alleged that Deputy Gohde violated his Fourth Amendment right to be free from excessive force when she failed to act to stop Deputy Harvey from "releasing Drago on a misdemeanor stop."  Finally, in Count 9, Bowman alleged that Deputy Harvey "wrongfully caused criminal proceedings to be instituted against . . . Bowman by submitting police reports . . . containing false statements and/or material omission[s]."  Bowman did not specify the alleged false statements or material omissions.  However, he alleged that Deputy Harvey did not have "probable cause or arguable probable

Bowman refused to submit a blood sample as part of the Sheriff's Office's investigation into whether he was driving under the influence.

24-13195                Opinion of the Court                11

cause" for the fleeing and eluding charge, and that Deputy Harvey brought the allegations against Bowman "with malice . . . by a desire to cover up [the officers'] own violent, bad acts perpetrated against Bowman." Bowman sought compensatory damages, punitive damages, and attorney's fees.

Deputies Harvey and Gohde filed a joint motion for summary judgment, arguing that they were entitled to qualified immunity. Bowman opposed the motion.

Upon review, the district court concluded that Deputies Harvey and Gohde were entitled to qualified immunity on Bowman's § 1983 claims for excessive force and malicious prosecution.[14] Specifically, the district court concluded that

---

[14] Bowman asserts that the district court failed to view the facts in the light most favorable to him and misapplied *Scott v. Harris* in evaluating his claims. We disagree. The district court construed all of the evidence and drew all reasonable inferences in the light most favorable to Bowman, except where the dashcam footage and audio blatantly contradicted Bowman's version of events. This approach is a proper application of *Scott*. *Brooks*, 78 F.4th at 1271 ("*Scott* stands for the commonsense proposition that when a video proves that the plaintiff can't be telling the truth, we don't accept the facts as he alleges them, even for purposes of deciding a summary-judgment motion."). To the extent that Bowman maintains that his case is factually distinguishable from *Scott*, we agree, and the district court did not suggest otherwise. But those factual differences have no bearing on the application of the underlying rule in *Scott* that, where a video (or in this case clear audio) utterly discredits the plaintiff's version of events, the district court should not credit the discredited portions of the plaintiff's version at the summary judgment stage. In sum, we conclude that the district court properly applied the *Scott* principle as well as general summary judgment principles.

12                    Opinion of the Court                    24-13195

Deputy Harvey's deployment of Drago did not amount to excessive force because an objectively reasonable officer in Deputy Harvey's position would have had probable cause to believe that Bowman violated Florida's fleeing and eluding statute and that Bowman's conduct created a threat to officer safety such that non-deadly force was necessary to gain control of Bowman. Relatedly, the district court concluded that the duration of Drago's attack—which at the absolute longest was two minutes and twelve seconds—was not excessive because Bowman was not subjected to an attack longer than was necessary for Deputy Harvey to secure Bowman. Thus, Bowman's Fourth Amendment rights were not violated. Relatedly, because Bowman's Fourth Amendment rights were not violated, the district court held that Deputy Gohde could not be liable for failing to intervene. Finally, with regard to the malicious prosecution claim, the district court held that Deputy Harvey was entitled to qualified immunity because Deputy Harvey had probable cause to arrest Bowman for fleeing and eluding, and Bowman failed to identify any facts that would plausibly suggest that Deputy Harvey included false allegations in the warrant affidavit.[15] Accordingly, the district court granted the deputies' motion for summary judgment on the § 1983 claims for excessive force and malicious prosecution.[16]

---

[15] The district court also concluded that Deputy Harvey had arguable probable cause to arrest Bowman for DUI. Bowman does not challenge this ruling on appeal; therefore, we do not address it further.

[16] Throughout his briefing, Bowman faults the district court for not analyzing the event from his perspective, but Bowman fundamentally misunderstands

Bowman subsequently filed a motion for reconsideration, which the district court denied. This appeal followed.

## II.    Standard of Review

We review *de novo* a district court's grant of summary judgment, viewing "the evidence and all reasonable inferences drawn from it in the light most favorable to the nonmoving party." *Battle v. Bd. of Regents for the State of Ga.*, 468 F.3d 755, 759 (11th Cir. 2006). Summary judgment is proper if the evidence shows "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "[T]he substantive law will identify which facts are material. Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary

the qualified immunity inquiry. While we view the facts in the light most favorable to Bowman at the summary judgment stage, the qualified immunity analysis focuses solely on the perspective of an objectively reasonable officer on scene. *See Baker v. City of Madison*, 67 F.4th 1268, 1279 (11th Cir. 2023) (explaining that, under the Fourth Amendment's objective reasonableness standard, "we judge the officer's use of force on a case-by-case basis from the perspective of a reasonable officer on the scene" (quotations omitted)). In other words, Bowman's intent, state of mind, and his subjective feelings in the moment are irrelevant to the qualified immunity analysis. Likewise, under this objective standard, the deputies' subjective intent or motivations are also irrelevant. *Graham v. Connor*, 490 U.S. 386, 397 (1989) ("[T]he 'reasonableness' inquiry in an excessive force case is an objective one: the question is whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation."). Therefore, we do not address Bowman's allegations concerning his or the deputies' states of mind or alleged motivations.

judgment.  Factual disputes that are irrelevant or unnecessary will not be counted."  *Anderson*, 477 U.S. at 248; *see also Mize v. Jefferson City Bd. of Educ.*, 93 F.3d 739, 742 (11th Cir. 1996) ("Genuine disputes are those in which the evidence is such that a reasonable jury could return a verdict for the non-movant." (quotations omitted)).  "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no genuine issue for trial."  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (quotations omitted).

### III.    Discussion

Bowman argues that the district court erred in granting the deputies' motion for summary judgment because (1) Deputy Harvey's use of Drago and the duration of the attack constituted excessive force; (2) Deputy Gohde had a duty to intervene to stop the use of excessive force; and (3) Deputy Harvey lacked probable cause to arrest Bowman for fleeing and eluding as evidenced by the fact that a jury later acquitted him of that charge.  After reviewing relevant qualified immunity principles, we turn to the merits of Bowman's claims.

Qualified immunity shields law enforcement officials from suit against them in their individual capacities for discretionary actions they perform in carrying out their duties, *Brooks*, 78 F.4th at 1279, so long as their conduct "does not violate clearly established statutory or constitutional rights of which a reasonable person would have known," *Mullenix v. Luna*, 577 U.S. 7, 11 (2015) (quotations omitted).  "[B]ecause government officials are not

required to err on the side of caution, qualified immunity is appropriate in close cases where a reasonable officer could have believed that his actions were lawful." *Lee v. Ferraro*, 284 F.3d 1188, 1200 (11th Cir. 2002) (alteration adopted) (quotations omitted). In other words, "qualified immunity protects all but the plainly incompetent or those who knowingly violate the law." *Mullenix*, 577 U.S. at 12 (quotations omitted).

The qualified immunity inquiry involves a burden-shifting analysis. *Lee*, 284 F.3d at 1194. The first step requires a defendant to show that he was acting within the scope of his discretionary authority when committing the challenged act. *Id.* "Once the defendant does that, the burden shifts to the plaintiff, who must show that qualified immunity is not appropriate" by establishing: "(1) the defendant violated a constitutional right, and (2) that constitutional right was clearly established at the time of the defendant's actions." *Brooks*, 78 F.4th at 1280 (quotations omitted).

The parties do not dispute that Deputy Harvey and Deputy Gohde were acting within their discretionary authority. Therefore, the burden shifted to Bowman to show that the deputies were not entitled to qualified immunity. *Id.* In determining whether Bowman established a violation of a constitutional right, we ask "whether, taken in the light most favorable to [Bowman], the facts show that [the officers'] conduct violated a constitutional right." *Lee*, 284 F.3d at 1197.

With these principles in mind, we turn to Bowman's claims on appeal.

### A.  Excessive Force Claim Against Deputy Harvey

Bowman argues that the district court erred in granting Deputy Harvey summary judgment on his § 1983 claim for excessive force.  He maintains that Deputy Harvey's deployment of Drago and the duration of Drago's attack constituted an objectively unreasonable use of excessive force in violation of the Fourth Amendment.

The Fourth Amendment sets forth a "right of the people to be secure in their persons . . . against unreasonable . . . seizures." U.S. Const. amend. IV.  This right "encompasses the plain right to be free from the use of excessive force." *Lee*, 284 F.3d at 1197. Excessive force claims are judged under the Fourth Amendment's objective reasonableness standard.  *Graham*, 490 U.S. at 395–96. "That standard requires us to ask 'whether the officer's conduct was objectively reasonable in light of the facts confronting the officer.'" *Patel v. City of Madison*, 959 F.3d 1330, 1338–39 (11th Cir. 2020) (alterations adopted) (quoting *Vinyard v. Wilson*, 311 F.3d 1340, 1347 (11th Cir. 2002)).  Accordingly, we must examine the totality of the circumstances, "including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Graham*, 490 U.S. at 396.  "Other considerations are the need for the application of force, the relationship between the need and the amount of force used, [and] the extent of the injury inflicted . . . ." *Baker*, 67 F.4th at 1279.  Importantly, "[t]he calculus of reasonableness must

embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Graham*, 490 U.S. at 396–97.

Finally, we note that "[t]he Constitution tolerates some uses of a dog" in effectuating arrests when necessary. *Edwards v. Shanley*, 666 F.3d 1289, 1295 (11th Cir. 2012); *see also Graham*, 490 U.S. at 396 ("Our Fourth Amendment jurisprudence has long recognized that the right to make an arrest or investigatory stop necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it.").

Here, in light of the facts and circumstances confronting Deputy Harvey and Deputy Gohde, the deployment of Drago was objectively reasonable. Deputy Harvey and Gohde had activated their lights and sirens in order to effectuate a traffic stop, but Bowman did not stop. Instead, he continued driving down a dark street at night for almost a minute before finally turning into a neighborhood that was unknown to the officers. Although Bowman disputes that he was fleeing and eluding the officers and merely intended to drive to a safe location (*i.e.*, his house) before pulling over, an objectively reasonable officer under the circumstances could have perceived Bowman's failure to promptly pull over and continued driving as an attempt to flee and elude the officers in violation of Florida law.[17]    *See* Fla. Stat. § 316.1935

---

[17] Bowman also argues that the officers violated police protocol in conducting the stop by not utilizing the public address system on their vehicle to verbally

(defining fleeing or attempting to elude an officer under Florida law as including the failure to stop when an officer in a law enforcement vehicle, with sirens and lights activated, orders the motorist to stop); *see also Manners v. Cannella*, 891 F.3d 959, 970 (11th Cir. 2022) (holding that officers had probable cause to believe that the defendant committed the offense of fleeing and attempting to elude under Florida law where the defendant failed to stop and "continued to drive for three blocks, or one-tenth of a mile" at a slow rate of speed in order to pull into a "well-lit gas station"). Attempting to flee and elude law enforcement is an indisputably serious offense, which weighs in favor of Deputy Harvey's use of force.[18] *See Sykes v. United States*, 564 U.S. 1, 9 (2011) ("The attempt

---

articulate their request that Bowman pull over and by ignoring various internal protocols that allegedly provide that officers should avoid conducting stops on roadways or traffic lanes. Even assuming Bowman is correct that the police violated these internal protocols, these allegations are irrelevant to the question of whether the officers used excessive force in violation of the Fourth Amendment by deploying a police canine to effectuate Bowman's arrest.

[18] Bowman repeatedly argues in his brief that there was no basis for the officers to believe he was fleeing and eluding as evidenced by the fact that a Florida jury later acquitted him of that charge. Again, Bowman misunderstands the qualified immunity inquiry, which requires us to examine the facts and circumstances known to the officer on the scene and evaluate whether those facts and circumstances would have led an objectively reasonable officer to believe that the defendant was committing or had committed an offense. *Baker*, 67 F.4th at 1279. A defendant's subsequent acquittal on a charged offense stemming from the defendant's encounter with the police has no bearing on our qualified immunity analysis. *See, e.g.*, *Lee*, 284 F.3d at 1195 ("Although probable cause requires more than suspicion, it does not require convincing proof and need not reach the same standard of conclusiveness and

to elude capture is a direct challenge to an officer's authority. . . . The felon's conduct gives the officer reason to believe that the defendant has something more serious than a traffic violation to hide."), *overruled on other grounds by Johnson v. United States*, 576 U.S. 591, 606 (2015).

Then after pulling over, the dashcam audio confirms that Bowman failed to comply with Deputy Harvey's repeated commands to exit the vehicle and instead engaged in a tense verbal exchange with Deputy Harvey for over a minute before finally exiting the vehicle. However, Bowman's argumentative behavior did not end there. Instead, after exiting the vehicle, Bowman continued to engage in a verbal exchange with Deputy Harvey and refused to comply with Deputy Harvey's commands to turn around, face away from the deputy, and walk backwards towards the officers. The record confirms that Bowman received several warnings that Deputy Harvey would release Drago if Bowman failed to comply, yet Bowman refused to walk toward the deputy. Under these circumstances, an objectively reasonable officer could have (1) perceived Bowman as a threat to officer safety and that he was actively resisting arrest and (2) reasonably determined that deployment of the police dog was necessary to gain Bowman's

---

probability as the facts necessary to support a conviction." (alteration adopted) (quotations omitted)); *Wood v. Kesler*, 323 F.3d 872, 879–81 & n.12 (11th Cir. 2003) (concluding that officer was entitled to qualified immunity because he had probable cause to issue the reckless driving citation and to arrest the defendant, notwithstanding the fact that the defendant was later acquitted of the reckless driving charge).

compliance.[19]  Thus, based on the facts and circumstances of this case, we conclude that Deputy Harvey's deployment of Drago was an objectively reasonable use of excessive force.  *See Edwards*, 666 F.3d at 1295 ("[B]ecause the evidence shows that [the defendant] had not yet tried to surrender when [the officer] allowed his dog to first bite [the defendant's] leg, this is the sort of 'split-second' determination made by an officer on the scene that *Graham* counsels against second guessing.").

Next, Bowman argues that the duration of Drago's bite amounted to excessive force.  Drago's encounter with Bowman was not captured on video, but we agree with the district court that, based on the time between the dashcam audio establishing Drago's release and the video footage showing Deputy Harvey returning Drago to the police cruiser, the absolute longest the encounter could have lasted is two minutes and twelve seconds. Bowman does not allege that Drago bit him multiple times, in multiple areas, or otherwise mauled him.  Instead, he argues that he had surrendered and was not resisting, which rendered the

---

[19] Bowman argues that he was simply scared because the officers had guns drawn on him and a jury could have easily determined that his verbal exchange and conduct were motivated by "distress and fear."  However, as explained previously, Bowman's subjective state of mind is not relevant to determining whether the deputies were entitled to qualified immunity. *Baker*, 67 F.4th at 1279 (explaining that, under the Fourth Amendment's objective reasonableness standard, "we judge the officer's use of force on a case-by-case basis from the perspective of a reasonable officer on the scene" (quotations omitted)).

duration of Drago's bite objectively unreasonable and excessive force.

We agree that an officer engages in excessive force in violation of the Fourth Amendment if he allows a police canine to attack a person who has surrendered and is fully compliant. *Priester v. City of Riviera Beach*, 208 F.3d 919, 923–24 (11th Cir. 2000) (holding that it was unreasonable for officers to allow a police canine to bite a suspect for two minutes when the suspect was compliant, was not resisting arrest, and posed no threat). Similarly, it is "objectively unreasonable for [an officer] to allow the canine to continue attacking [a person] *after* he [is] secured." *See Crenshaw v. Lister*, 556 F.3d 1283, 1293 (11th Cir. 2009). However, neither of those situations apply here.

Rather, Bowman admitted in his deposition that he did not immediately surrender when Deputy Harvey deployed Drago. Instead, Bowman attempted to climb on the hood of his car to avoid the dog. Drago bit Bowman's right leg, and Bowman fell off the car and onto the ground, and a brief struggle ensued during which Bowman attempted to stand up while Drago was biting his leg. For approximately one minute, the dashcam audio captured Bowman repeatedly yelling "oh my God"; "help me"; "get your dog, bro"; "help"; "my leg"; and "I'm sorry, bro, get your dog, bro." Bowman testified that, during this time, Deputy Harvey approached Bowman and ordered him to put his hands behind his back. Bowman testified that he was unable to comply because Drago was biting his leg, and he was in pain. Deputy Harvey then

put his knee in Bowman's back and handcuffed him before removing Drago from Bowman's leg.  We have held that it is not excessive force for an officer to wait to call off a police canine until after the suspect was fully secured and handcuffed, "regardless of whether [the plaintiff] was actively resisting arrest at that point." *Id*.  Given Bowman's prior failures to comply with Deputy Harvey's commands, it was objectively reasonable for an officer to conclude that he needed to secure and handcuff Bowman before removing Drago from Bowman's leg.  *See id*; *see also Vinyard*, 311 F.3d at 1346 ("An officer will be entitled to qualified immunity . . . if an objectively reasonable officer in the same situation could have believed that the force used was not excessive.").  In light of these facts which show that Bowman by his own admission tried to get away from Drago and did not comply with Deputy Harvey's commands to put his hands behind his back after Drago bit him, there is no reasonable inference that Drago's bite involved greater force than was necessary to secure Bowman or was in any way unnecessarily prolonged.[20]

---

[20] Contrary to Bowman's argument, our decision in *Priester* does not establish that excessive force was used in this case.  In *Priester*, we held that an officer violated the plaintiff's Fourth Amendment right to be free from excessive force where the officer released a police canine and allowed it to attack the plaintiff—who was lying on the ground, fully compliant, was not posing a threat to the officers, and was not resisting arrest—for at least two minutes. 208 F.3d at 927.  As described above, Bowman's case is nothing like *Priester*. The dashcam audio and Bowman's own deposition testimony confirm that Bowman repeatedly did not comply with Deputy Harvey's commands, attempted to avoid Drago by climbing on his vehicle, and was resisting arrest.

Accordingly, in light of the above, we affirm the district court's determination that Deputy Harvey was entitled to qualified immunity on this excessive force claim.

### B. *Excessive Force Claim Against Deputy Gohde*

Bowman argues that, if we reverse the grant of summary judgment on his excessive force claim against Deputy Harvey, he is also entitled to relief on his excessive force claim against Deputy Gohde. Because we conclude that there was no excessive force Fourth Amendment violation as to Deputy Harvey's deployment of Drago or the duration of Drago's bite, we affirm the district court's grant of summary judgment in favor of Deputy Gohde. *See Sebastian v. Ortiz*, 918 F.3d 1301, 1312 (11th Cir. 2019) ("Plainly, an officer cannot be liable for failing to stop or intervene when there was no constitutional violation being committed.").

### C. *Malicious Prosecution Claim Against Deputy Harvey*

Bowman argues that the district court erred in granting summary judgment in favor of Deputy Harvey on the malicious prosecution claim. He maintains that Deputy Harvey lacked

---

Under the Fourth Amendment's objective reasonableness standard, "we judge the officer's use of force on a case-by-case basis from the perspective of a reasonable officer on the scene." *See Baker*, 67 F.4th at 1279 (quotations omitted). Given the factual differences, *Priester* does not compel the conclusion that Deputy Harvey used excessive force.

probable cause to believe that Bowman violated Florida's fleeing and eluding statute.[21]

"To establish a § 1983 malicious prosecution claim, the plaintiff must prove two things: (1) the elements of the common law tort of malicious prosecution; and (2) a violation of his Fourth Amendment right to be free from unreasonable seizures." *Grider v. City of Auburn*, 618 F.3d 1240, 1256 (11th Cir. 2010) (emphasis omitted). Critically, "the existence of probable cause defeats a § 1983 malicious prosecution claim." *Id.* "Probable cause is defined as facts and circumstances sufficient to warrant a prudent man in believing that the suspect had committed or was committing an offense." *Id.* at 1257 (quotations omitted).

The circumstances and facts in this case were sufficient to warrant a reasonably prudent officer to believe that Bowman was fleeing and eluding the police in violation of Florida law. Specifically, even though the officers had activated their lights and sirens, Bowman did not stop his vehicle. Instead, he continued driving for almost a minute before stopping, which provided the officers with probable cause to believe that he had violated

---

[21] Bowman also alleges in passing that Deputy Harvey made unspecified "fraudulent statements" in the warrant affidavit. Bowman did not explain in the district court (or on appeal) what statements in the warrant affidavit were false. Thus, his conclusory allegation does not demonstrate that the district court erred in granting summary judgment on his malicious prosecution claim. Moreover, as we explain further, Deputy Harvey had probable cause to arrest Bowman for fleeing and eluding, and, therefore, his malicious prosecution claim necessarily fails as a matter of law.

Florida's felony fleeing and eluding statute. *See* Fla. Stat. § 316.1935(1)–(2) (defining fleeing or attempting to elude an officer under Florida law as including the failure to stop when an officer in a law enforcement vehicle, with sirens and lights activated, orders the motorist to stop); *see also Manners*, 891 F.3d at 970 (holding that officers had probable cause to believe that the defendant committed the offense of fleeing and attempting to elude under Florida law where the defendant failed to stop and "continued to drive for three blocks, or one-tenth of a mile" at a slow rate of speed in order to pull into a "well-lit gas station"). Accordingly, Bowman's malicious prosecution claim necessarily failed, and the district court did not err in granting Deputy Harvey summary judgment on this claim. *Grider*, 618 F.3d at 1256.

## IV.   Conclusion

For the above reasons, we affirm.

**AFFIRMED.**